102

LINDY BROS. BUILDERS, INC. OF
PHILADELPHIA, et al.

v.

AMERICAN RADIATOR & STANDARD
SANITARY CORP. et al.

Appeal of FRIENDSWOOD DEVELOP-
MENT COMPANY and Humble Oil
& Refining Company, Claimants.

Appeal of Harold E. KOHN, P. A., et al.

Nos. 74–2189 and 74–2255.

United States Court of Appeals,
Third Circuit.

Argued Sept. 8, 1975.

Reargued May 14, 1976.

Decided July 2, 1976.

As Amended July 26, 1976.

Arthur R. Miller, Cambridge, Mass., Harold E. Kohn, Stuart H. Savett, David H. Weinstein, Jay R. Stiefel, Carole Broderick, Harold E. Kohn, P. A., David Berger, H. Laddie Montague, Jr., Gerald Jay Rodos, David Berger, P. A., Philadelphia, Pa., for appellees and cross-appellants.

William Simon, G. Joseph King, Howrey, Simon, Baker & Murchison, Washington, D. C., for appellants.

Argued Sept. 8, 1975.

Before ALDISERT, GIBBONS and WEIS, Circuit Judges.

Reargued May 14, 1976.

Before SEITZ, Chief Judge, and ALDISERT, GIBBONS, ROSENN, HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question presented is whether the district court properly applied the guidelines for awarding attorneys' fees we set forth when this matter was previously before us. 487 F.2d 161 (3d Cir. 1973) (*Lindy I*). We affirm in part, but vacate the judgment and remand for entry of an order in accordance with this opinion.

 This protracted litigation emanates from the plumbing fixtures cases.[1] In connection with final court approval of the settlement of claims by the national class[2] of builder owners, the district court awarded attorneys' fees to Harold E. Kohn and David Berger, and their respective firms.[3] Those participating in the settlement fund may be categorized into three groups: appellees Kohn and Berger represented the first category; other lawyers, not implicated in this appeal, represented those in the second category; the third consisted of class members not represented by counsel until after court approval of the settlement. Two members of this third category— Friendswood Development Company and

---

1. The United States obtained criminal antitrust indictments against plumbing fixture manufacturers and their trade association. *Lindy I,* 487 F.2d at 163. Subsequently, some 370 private treble damage actions were filed against the same defendants. The Judicial Panel on Multidistrict Litigation then ordered the cases consolidated before a single district court judge. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 341 F.Supp. 1077, 1079 (E.D.Pa.1972), and cases cited at *ibid.* n.2.

2. The district court did not formally certify the class under Rule 23, but established a "temporary class of plaintiffs" "[f]or purposes of set-

tlement only", and designated the clients of Kohn as "temporarily selected to represent the Temporary Settlement Class", thereafter referring to them as the Class Representatives. App. at 30–31.

3. For a more detailed background of the instant litigation see 341 F.Supp. 1077 (E.D.Pa.1972), *vacated and remanded,* 487 F.2d 161 (3d Cir. 1973) *(Lindy I), on remand,* 382 F.Supp. 999 (E.D.Pa.1974).

Kohn and Berger filed a timely cross appeal. Rather than refer to them as "appellees and cross-appellants", however, in the interests of simplicity, we refer to them herein only as "appellees".

Humble Oil & Refining Company—objected to the fee award to Kohn and Berger, and appealed. The award was vacated and the cause remanded, fees were awarded again, and Friendswood and Humble have appealed again. Although the three categories were not formally denominated as subclasses, see F.R.Civ.P. 23(c)(4), appellants advance arguments which obtain unerringly for all members of the third category. Accordingly, we treat the contentions as applicable to all members of the third category.[4]

In its opinion on remand, the district court determined that appellees were entitled to attorneys' fees of $1,134,765.45 from the settlement fund then valued at $29.3 million. Of this amount, the district court ordered members in the third category—the previously unrepresented claimants—to pay $925,968.61. Thus, the district court ordered members of the third category to pay 81.6 per cent of the attorneys' fee from the settlement fund, even though their aliquot share of the fund was only about $8,145,400 or 27.8 per cent. The district court ordered no further payment of attorneys' fees from the settlement fund, but appellees were to receive $861,191 under private contracts with their clients, the members of the first claimant category.

Any understanding of the specific issues in this appeal must start with the rules we enunciated when these proceedings were here before. The district court has properly summarized what we said:

> In discussing the proper standards which would govern the award of fees in a case of this sort, . . . . . the first inquiry of the Court should be into the hours spent by the attorneys, including how many hours were spent in what manner by which attorneys. 487 F.2d at 167. After determining the time spent, the district court should then undertake to fix an hourly rate of compensation to be applied to the hours worked. While the amount thus found to constitute reasonable compensation should be the "lodestar" of the Court's fee determination, at least two other factors should be taken into account in computing the value of attorneys' services, namely the contingent nature of success and the extent, if any, to which the quality of an attorney's work mandates either increasing or decreasing the amount to which the Court has found the attorney reasonably entitled. 487 F.2d at 168. Finally, after determining the total reasonable value of an attorney's services in securing recovery of a fund for the class, the Court should determine what portion of that amount should be paid by the unrepresented claimants. [Absent extraordinary circumstances, the unrepresented claimants should pay for the attorneys' services in proportion to their benefit from them—that is, the unrepresented claimants should pay a percentage of the reasonable value of the attorneys' services to the class equal to their percentage of the class' recovery.] 487 F.2d at 169.

382 F.Supp. at 1003.

The appellants press four contentions: (1) The district court should have made no award for services performed by the Berger firm; (2) The district court should have excluded certain specific services performed by appellees from the "lodestar" defined in Lindy I; (3) The district court should not have doubled the "lodestar" to reflect (a) contingency and (b) quality factors; and (4) The district court required category three claimants to pay a disproportionate share of the attorneys' fees from the settlement fund.

I.

Appellants' contention that the Berger firm should not participate at all in the attorneys' fee awarded from the fund rests on two premises: (a) that Berger and his firm contributed nothing to the creation of the settlement fund, and (b) that, in any event, Berger and his firm will be adequately compensated for their services in connection with this litigation.

In support, appellants marshal several subsidiary points. First, Berger claimed

---

4. Insofar as the cross appeal of Kohn and Berger urges a contrary approach, we reject it.

only one hour's time related to settlement work. *See ibid.* at 1007. Second, although Berger signed the settlement agreement with the defendants, he only did so because Kohn asked that Berger's name be included and no defendant objected. Brief for Appellants at 33–34. Third, the district court concluded that the reasonable value of all work performed by the Berger firm was $139,186.85. However, as a result of a 50–50 fee splitting agreement between Kohn and Berger, the Berger firm stood to gross about $893,500 from the litigation. *See* 382 F.Supp. at 1028, n.34. Finally, the Berger firm did not support its application with accurate, contemporaneously-made time records. Instead, it relied on a "reconstruction" of the hours expended.

▆ The district court was confronted with, and rejected, the identical arguments. We agree with its disposition. *Ibid.* at 1009–11. In summary, the district court found that the time expended by Berger and his firm "contributed materially to the creation of the settlement fund"; that Berger consulted with Kohn "at every stage of the proceedings"; that Kohn valued Berger's judgment and advice; and that Berger's firm reviewed briefs and pleadings for the Kohn firm during the early stages of the litigation. Upon a review of the record, we conclude that these findings of the district court were not clearly erroneous. *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972). With respect to the "reconstruction" of time expended, the district court stated:

. . . [T]ime records, although highly desirable, are not the only means of proving time spent in a multidistrict litigation of this sort. . . . Although mere estimates of time are not acceptable, an allowance of attorneys' fees may be based on a reconstruction, provided that the time records are substantially reconstructed and are reasonably accurate.

. . .

The evidence here discloses that the reconstruction was carefully and accurately done. . . . Indeed, from the record as a whole, it appears that peti-tioner Berger and his firm probably spent more time than they are claiming in connection with this litigation.

382 F.Supp. at 1011. Finding the basic facts not clearly erroneous, and determining that there is no error either in the court's reasoning or in its application of the proper legal precept, we affirm the district court on this point. Implicit in this conclusion is the understanding that the agreement between Kohn and Berger to split fees is simply irrelevant to the considerations mandated by *Lindy I.*

▆ Insofar as appellants urge that the Berger firm not receive an attorney's fee from the fund because Berger was not counsel for a court-appointed Class Representative, we reject the argument. We do not read the appellees' original petition as being on behalf of Kohn and Berger *qua* counsel for class representatives; rather, they petitioned "jointly as counsel for the plaintiffs and intervenor plaintiffs . . [where] the plaintiffs were designated by the Court as class representatives . . ." App. at 77. In addition, we are faced with the district court's findings of fact—that the Berger firm benefited the fund—which we will not upset.

II.

▆ The district court excluded from its "lodestar" determination the time spent by appellees in negotiating fee arrangements with, and in preparing claim forms for, privately retained claimants. Although Kohn and Berger filed a cross appeal, they do not contest the propriety of this ruling. In any event, we would agree with the district court.

Appellants contend that the court also should have excluded from the "lodestar" time expended (A) relating to appellees' application for attorneys' fees and (B) on interventions. The district court fixed the reasonable value of appellees' services relating to the fee application at $29,806.25. In addition, the district court made an award in the amount of $40,654.00 for "time spent since March 20, 1974", all of which was time spent in connection with the fee

application.[5] Finally, with respect to fee application work, the district court awarded $320 to appellees for the services of para-professionals and law students. The reasonable value of work on interventions was $13,085, which figure the district court ultimately doubled, so as to award appellees $26,170 for interventions. 382 F.Supp. at 1024. We now address these contentions.

### A. Fee Application and Appeal

The propriety *vel non* of an award from the fund for services relating to the fee application itself [6] turns on considerations of the basis for, and the nature of, the award from the settlement fund.

Federal courts have long recognized "the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975); *see, e. g., Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881). *See generally* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1803 (1972); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv.L.Rev. 1597 (1974) [hereinafter cited as Dawson]. As we said in *Lindy I*, "[t]he award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for

the value of the service performed." 487 F.2d at 165. Accordingly, "a benefit to the fund is supposedly required. . . . The standard formula [of benefit] . . . mix[es] together three distinct ideas: that a fund can be benefited by being 'created, increased or protected' (or 'preserved')." Dawson at 1626. Generally, where litigation involves the competing interests of claimants to a common fund, no attorneys' fees should be awarded. The reason is that, "if the interests are in conflict, success for one side means no benefit for the other and for a charge against a fund a benefit is required." *Ibid.* at 1638 (footnote omitted).

We subscribed to these general views in *Lindy I,* where we said:

> [T]here are two possible "causes of action" that may be urged as the basis for award of attorneys' fees. One of these "causes" belongs to the plaintiff who brought the underlying suit. His claim is that by instituting the suit he has performed a service benefiting other class members. . . .
>
> The second "cause of action" for award of attorneys' fees under the equitable fund doctrine belongs to the attorney. The attorney's claim is that his conduct of the suit conferred a benefit on all the class members, that one or more class members has agreed by contract to pay for the benefit the attorney conferred upon him, and that the remaining class members should pay what the court determines to be the reasonable value of the services benefiting them.

487 F.2d at 165; [7] *see SEC v. Aberdeen Securities Co.*, 526 F.2d 603, 607 (3d Cir. 1975); *cf. Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975) (*Merola II*) (discussing non-pecuniary benefit as factor affecting "lodestar" award).

---

5. The district court's award for "future time" sought to compensate appellees for their work in connection with the distribution of the then remaining portion of the fund. Accordingly, appellants' challenge to this part of the award is on a different footing from those treated in the text above. We treat the challenge to the award for future time *infra,* Part VI.

6. Our previous decisions in this area have specifically left this question open. *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 173 & n.7 (3d Cir. 1975).

7. For the proposition that either the attorney or his client may bring the suit, see, too, Dawson 1606–07.

The district court concluded that time spent in pursuing the fee application was "a part of the administrative expense necessarily incurred in administering the fund. . . . . Services performed in this connection are indeed of benefit to the class as a whole because they enable the Court to make its determination on the basis of a full and accurate presentàtion of all relevant facts." 382 F.Supp. at 1012.

 Services performed in connection with the fee application are necessary to the attorney's recovery. They benefit *him,* for without them, the attorney cannot, since *Lindy I,* recover. But such services do not benefit *the fund*—they do not create, increase, protect or preserve it. Accordingly and in the circumstances of this case, we accept the prevailing rule for litigation involving the competing interests of claimants to a common fund. See page 110, *supra.* There being no benefit to the fund from services performed by appellees in connection with their fee application, there should be no attorneys' fee award from the fund for those services. The district court, therefore, erred in awarding $29,806.25 for the fee application work prior to March 20, 1974, in awarding $40,654 for work after March 20, 1974, and in awarding $320 for fee application work by paraprofessionals and law students.

Having made a determination of the applicable rule of law for the case before us, it is important to emphasize that which is not before us. We do not decide today what the rule should be where the fee application is pressed by the client himself, and competing interests among claimants surface. *Cf.* Dawson 1634 n.126. Nor do we decide the rule for the situation where a competing claimant to a common fund persuades the court in the first instance to set an attorney's fee inadequate under *Lindy I,* thereby necessitating an appeal.[8] We specifically reserve these issues.

*B. Intervention*

 Appellants challenge the district court's award for time expended on interventions contending that this work in no way benefited the class. They argue that there was no reason to intervene in this multidistrict class action because class members dissatisfied with the representation of the class might opt out and thereby avoid the binding effect of a 23(b)(3) action. F.R.Civ.P. 23(c)(2).

The district court considered and rejected appellants' argument. It found that time spent on interventions "was beneficial to the class as a whole", and continued:

Faced with many additional litigants with sufficient financial resources to finance the cost of notice to the class and also the cost of a protracted trial, defendants in this case were under much more pressure to settle than otherwise. In its recent decision in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Supreme Court held that class representatives must pay the cost of the notice required by Rule 23 in a case such as this one. The cost of notice in this case was approximately $150,000, a sum which was paid from the settlement fund. Had there been no settlement, plaintiffs and intervenors would have been required to advance this sum if this litigation were to go ahead as a national class action.

382 F.Supp. at 1013; *see ibid.* at 1010.

We agree with appellants that, since the 1966 amendments to Rule 23, there is no necessity for intervention in a 23(b)(3) class action. Indeed, Berger admitted as much during his deposition. But this truism cannot end the analysis. While intervention may no longer be necessary, it is certainly still permissible. The federal rules allow intervention "of right" when an applicant's interest is not "adequately represented by existing parties." F.R.Civ.P. 24(a). Moreover, Rule 23 itself states that the district

---

**8.** In such a case, the attorney might argue that he was entitled to recover fees for the prosecution of the subsequent litigation, not on the theory that his services benefited the fund entitling him to a quantum meruit recovery, but on the theory that any adverse claimants who acted to deny him the proper fee unjustly enriched themselves in the initial action.

court may make appropriate orders, *inter alia,* "requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given . . . of the opportunity of members to signify whether they consider the representation fair and adequate, *to intervene* and present claims or defenses, or otherwise to come into the action." F.R. Civ.P. 23(d)(2) (emphasis added).

As rehearsed previously, the propriety of a particular award for an attorney's services from a common fund depends on whether the specific services benefited the fund—whether they tended to create, increase, protect or preserve the fund. Appellants argue that, because intervenors did not advance the costs of notice, their presence in the case did not benefit the fund. This argument misses the mark. The point is, and the district court so found, that, when confronted by the intervenors and the financial strength they added to the plaintiff class, "defendants . . . were under much more pressure to settle." This finding was not clearly erroneous. *Krasnov v. Dinan, supra.* We must conclude, therefore, that the services performed on intervention helped to create the fund—they helped to force the settlement.

In the instant case, there was never a formal class certification. Brief for Appellants at 7; *see* n.2 *supra.* Thus, the interests of those that intervened were not formally represented by the named plaintiffs who sought to be class representatives. In these circumstances, it may not be said that the interventions served only to clutter the action. Accordingly, the district court did not err when it awarded Kohn and Berger fees for services performed on interventions.

We express no opinion on whether attorneys' fees for services on interventions should be awarded from an equitable fund

where the interventions occur after a class certification. In such circumstances, it might be argued that intervention serves no essential purpose, for class certification requires a finding of adequate representation. See F.R.Civ.P. 23(a)(4), 23(c)(2)(C), 23(d)(2), 24; 7A C. Wright & A. Miller, Federal Practice and Procedure § 1799 (1972).

### III.

■ *Lindy I* instructs that, in addition to the "lodestar", the court's computation of the value of attorneys' services should reflect two other factors—the contingent nature of success and the quality of the attorney's work. 487 F.2d at 168. In *Merola II* we observed that the second factor is "evidenced by the work observed, the complexity of the issues and the recovery obtained. In settled cases, the second additional factor [quality] is reflected largely in the benefit produced. It permits the court to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested, or to reduce the objectively determined fee where the benefit produced does not warrant awarding the full value of the time expended." 515 F.2d at 168–69.

Although the district court did not have the benefit of *Merola II,* its analysis generally followed these lines. With certain exceptions [9] that need not detain us, the district court doubled the amounts deemed reasonable compensation on the basis of hourly rates "because of the contingency and quality factors". 382 F.Supp. at 1024. In reaching this determination, the district court relied on the complexity of the litigation, the skill and experience of appellees Kohn and Berger, and the $29 million recovery.

Appellants argue that *Lindy I* resolved the contingency issue adversely to the at-

---

**9.** The district court doubled the amounts found to be reasonable compensation for the following categories of services: pleadings; discovery; court appearances; settlement; interventions; settlement administration; briefs and legal research; general matters, and other ap-

pellate proceedings. 382 F.Supp. at 1024. It did not double the award for the fee application and the appeal thereof; or that for paraprofessional and law students' work; or that for future time. *Ibid.*

torneys.[10] They also question the quality of the work performed. On these bases, they urge that the district court erred in increasing, by any amount, the sum deemed a reasonable hourly compensation for attorneys' services.

### A. Contingency

When appellants argue that *Lindy I* forecloses the contingency issue they not only misread the language of *Lindy I* upon which they rely, but they also belittle the district court's painstaking comparison between the limited effect of the criminal prosecutions and the breadth of the civil litigation.

Chief Judge Seitz said in *Lindy I*: "The court *may* find that the contingency was so slight . . . that an increased allowance for the contingent nature of the fee would be minimal." 487 F.2d at 168 (emphasis added). The language was permissive, not mandatory.

The district court specifically found the contingency factor was not slight, but rather justified "a substantial increased allowance". 382 F.Supp. at 1017. Success of the civil suits, the district court stated, depended on several contingencies:

(1) the uncertainty of the class members' ability to prove liability and damages;

(2) the existence of other categories of claimants in this litigation contending that they and not the builder-owners

were entitled to any recovery against the defendants;

(3) this Court's prior decision in *Maricopa County v. American Radiator & Standard Sanitary Corp.*, 323 F.Supp. 381 (E.D.Pa.1970), and *Mangano v. American Radiator & Standard Sanitary Corp.*, 50 F.R.D. 13 (E.D.Pa.1970), aff'd, 438 F.2d 1187 (3d Cir. 1971);

(4) the fact that the time period and range of products encompassed within the government's evidence in the criminal case was drastically more limited than the allegations in the complaints herein; and

(5) the settling defendants' denials of any violation of the antitrust laws and any overcharges, and the fact that they could have been expected to litigate all issues fully, including appeals if necessary.

*Ibid.* at 1015. Thus, assuming plaintiffs could prove that defendants had violated the antitrust laws, plaintiffs would have had to prove they, as distinguished from an alternate potential class of claimants in the distribution scheme, were entitled to collect damages. Moreover, at the outset of the civil litigation, defendants challenged the propriety of a national class action on the ground that it was unmanageable. Perhaps most important, however, and as more specifically set forth by the district court, *ibid.* at 1015–16, only three of the 16 defendants were convicted after original not guilty

---

10. In *Lindy I,* we stated:

> In assessing the extent to which the attorneys' compensation should be increased to reflect the unlikelihood of success, the district court should consider any information that may help to establish the probability of success. The most important such information in a civil antitrust suit may be the progress of any criminal action brought against the defendants. Here, the United States had obtained indictments against all the defendants before the civil suits were filed; the defendants who pleaded not guilty had been convicted before serious settlement negotiations were begun; and those convictions were affirmed before the court gave final approval to the settlement. The court may find that the contingency was so slight or the amount found to constitute reasonable

compensation for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal.

487 F.2d at 168. In a footnote, we added:

> The threshold issue in antitrust cases is the defendant's violation of the antitrust laws. If the defendant in a criminal antitrust action is convicted after a plea of not guilty, the criminal conviction is prima facie evidence of violation of the antitrust laws. 15 U.S.C. § 16 (1970). We recognize that convictions following pleas of nolo contendere are not entitled to the same evidentiary position as convictions following not guilty pleas and that even where violation of the antitrust laws is established, civil plaintiffs must prove that they were injured by the violation.

*Ibid.* n.12.

pleas. The 13 other defendants pleaded *nolo contendere,* thus imposing on plaintiffs the evidentiary burdens to which Chief Judge Seitz alluded in his footnote 12 to *Lindy I, supra* at n.10. This analysis led the district court to conclude:

> Thus, this was not a case where plaintiffs received from the government on a silver platter the evidence necessary to prove their claims against the three convicted defendants, much less against the thirteen which had entered pleas of *nolo contendere.* Substantial problems of proof were present as to both liability and damages. Yet petitioners were able to negotiate settlements with all defendants which yielded funds producing $10.75 for each bathroom unit purchased by claimants during the full four-year period.

*Ibid.* at 1016.

### B. Quality

 Appellants contend further: that "[t]he bulk of the time claimed in this case was on routine matters", that this "was not a complex antitrust case involving novel substantive issues", and that "the result achieved was not outstanding". Brief for Appellants at 45–46.

The answer to the first argument is that *Lindy I* does not dictate consideration of the proportion of time spent on routine matters in assaying the quality factor. The "lodestar" concept reflects such considerations, encompassing the amount of time spent on various projects, the status of individual attorneys, and the reasonable hourly rate for each person for each service performed. See *Lindy I,* 487 F.2d at 167.

We might agree with appellants that the basic issue in the case—a price-fixing conspiracy—did not involve novel substantive issues. But that agreement would not detract from the complexity of this massive multidistrict litigation, nor from the novelty of the myriad attendant subsidiary issues. On this score, the district court stated:

> Petitioners were here participating in no run-of-the-mill class suit. The plumb-

ing fixture antitrust litigation has involved the largest number of cases of any matter that has ever come before the Judicial Panel on Multidistrict Litigation. 374 cases are included in this one massive litigation. Over 10,000 claims were filed in the builder-owner settlement alone.

382 F.Supp. at 1019 (footnote omitted). We do not consider this finding of complexity clearly erroneous, but, as hereinafter set forth, we question whether this factor should be considered under the rubric of quality of professional performance.

The court also detailed the skill and experience of appellees Kohn and Berger, and the members of their firms, to support its finding of quality service. The court concluded:

> Petitioners Kohn and Berger and various members of their firms have filed many briefs and pleadings which have been reviewed by the undersigned judge and have personally appeared before the undersigned on many occasions since June of 1970. The record here also includes various pleadings, briefs and memorandum filed before that date. From a review of these written materials and from personal observations, this Court concludes that petitioners have exhibited an unusual degree of skill in conducting these proceedings. They were aggressive and imaginative throughout. Because the work has been efficient and of an atypical quality, the aggregate hourly compensation should be increased. Indeed, the total amount of time spent by petitioners in this case is relatively low when one considers what was accomplished and the number of years that have elapsed since the litigation was commenced. Certainly, economy of effort should not be penalized. Less experienced and less skillful attorneys would undoubtedly have expanded much more time in achieving the same result than did petitioners.

*Ibid.* at 1021–22.

 Finally, appellants deprecate the $29.3 million settlement as being "merely an 'acceptable'" one, Brief for Appellants

at 46, now representing about $10.75 per bathroom unit sold during the term of the price-fixing conspiracy. In answer to this argument, the district court observed that the per unit settlement figure was "two to three times the actual price increase" resulting from the conspiracy, 382 F.Supp. at 1022, and that the builder-owner settlement was "a much larger per unit figure than" the contractor or wholesaler settlements, *ibid.* The court concluded, "the original settlement was a most favorable one [as] indicated by the fact that only one attorney opposed it" when presented for approval. *Ibid.* We quite agree.

We must now determine whether the district court committed error by using these considerations to increase its "lodestar" award for several categories by 100 per cent.

### C. Doubling

To evaluate the district court's doubling of the "lodestar" we first must recognize distinctions in the juridical functions of trial and reviewing courts, and the concomitant differences in their respective responsibilities. As we have often said, the award of a reasonable attorney's fee is within the district court's discretion.[11] *Merola v. Atlantic Richfield Co.,* 493 F.2d 292, 295 (3d Cir. 1974) *(Merola I); Lindy I, supra,* 487 F.2d at 166; *Tranberg v. Tranberg,* 456 F.2d 173, 175 (3d Cir. 1972). Unhappily, this formulation does not advance the analysis; it merely restates the problem, for one

must understand what one means by "discretion".

Ordinarily in the law, as the Ninth Circuit observed several years ago, "discretion"

> is defined as: "The power exercised by courts to determine questions to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court." 1 Bouv. Law Dict., Rawles' Third Revision, p. 884. Judicial action—discretionary in that sense—is said to be final and cannot be set aside on appeal except when there is an abuse of discretion. A common example is a court's ruling on the extent of cross-examination. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624. Discretion, in this sense, is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Delno v. Market St. Ry.,* 124 F.2d 965, 967 (9th Cir. 1942); *see Napolitano v. Campania Sud Americana de Vapores,* 421 F.2d 382, 384 (2d Cir. 1970). Thus, one may attack an exercise of discretion as "irrational". One seeking to establish such an abuse of discre-

---

11. Professor Maurice Rosenberg has suggested several reasons—two of which he considers legitimate—for the vesting of discretionary authority in trial courts. He has observed that "probably the most pointed and helpful one . . . is, paradoxically, the superiority of [the trial judge's] nether position. It is not that he knows more than his loftier brothers; rather, he sees more and senses more. In the dialogue between the appellate judges and the trial judge, the former often seem to be saying: 'You were there. We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial. Therefore, we defer to you.'" Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L.Rev. 635, 663 (1971); *see*

*Jourdan v. State,* 275 Md. 495, 512, 341 A.2d 388, 398 (1975) (Smith, J. dissenting from opinion finding declaration of mistrial erroneous):

> It is easy in any given situation, particularly in the isolation of the chambers of an appellate judge, to say that a certain course of action should or should not have been taken. I note that in a recent game involving the Baltimore Orioles a sportswriter questioned the wisdom of the manager in removing his starting pitcher in the ninth inning and his various moves thereafter, Baltimore having been ahead at the time of the removal and having ultimately lost the game by one run in the twelfth inning. The manager, however, was on the spot where he was obliged to make his determinations quickly upon the basis of his best judgment at the time. So was the trial judge in this instance.

tion, however, assumes a heavy burden. *Almquist v. Almquist,* 214 Kan. 788, 791, 522 P.2d 383, 386 (1974). *Lindy I* and *Merola I* both emphasize that the appellate court may also find an abuse, or more accurately a "misuse", of discretion where the trial court utilizes improper standards or procedures in determining fees. *Lindy I, supra,* 487 F.2d at 166; *Merola I, supra,* 493 F.2d at 295. Similarly, a clearly erroneous finding of fact may require reversal. *Ibid.*

Stated negatively, the appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision. Similarly, the appellate court may not reverse where the trial court employs correct standards and procedures, and makes findings of fact not clearly erroneous. In sum, "[i]f the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will defer to its exercise of · discretion." *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (in banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). But if the trial court has not properly identified and applied the criteria, the court's determination will not be entitled to such deference.

▇▇ As previously rehearsed, the district court went to great lengths to articulate clearly the reasons for its decision. *Cf. Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (D.C. Cir. 1970) (Leventhal, J.), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). The court found that the contingent nature of success alone justified "a substantial increased allowance". 382 F.Supp. at 1017. Inasmuch as we understand appellants to challenge the amount by which the district court increased the "lodestar" award, we decline the invitation to upset the exercise of discretionary authority. Had any one of us been the trial judge acting on this fee application, we might well have acted differently; we might have increased the basic award by 20, 50, or 75 per cent. But as appellate judges, we do not find the district court's action "so unreasonable or so arbitrary as to amount to a

prejudicial abuse of . . . discretion." *Napolitano v. Compania Sud Americana de Vapores, supra,* 421 F.2d at 384; *see* Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635, 662 (1971).

After thoroughly reviewing appellants' contentions, we have concluded that the district court followed the guidelines stated in *Lindy I*; accordingly, we cannot say that the district court abused its discretion in doubling the amount deemed a reasonable "lodestar" award for most categories of services performed.

The district court's struggle with this case on remand and the difficulties we encountered on review, however, persuade us that additional direction is necessary so that the district courts within this circuit may properly implement the teachings of *Lindy I.* We now turn to that task.

### IV.

Before detailing the factors relevant to what we, in *Lindy I,* termed "the contingent nature of success" and "the quality of an attorney's work", certain principles must be emphasized.

### A.

Preliminarily, we reaffirm the standards enunciated in *Lindy I, supra,* 487 F.2d at 167–69. Nothing in the augmentation hereinafter set forth should be considered as a dilution or diminution of that basic formula.

▇▇ We find it necessary also to observe that we did not and do not intend that a district court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It was not and is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work. In *Lindy I* we said: "Any increase or decrease in fees to adjust for

the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good. If the district judge determines that *particular work* was of a typical quality, he should, in increasing or decreasing the fee, be cognizant of the amount of time devoted to that *given activity*." 487 F.2d at 168–69 (emphasis added). The italicized words were not intended to carry the implication that, in assaying the quality of work that might affect the lodestar award, the district court should inquire separately into the components of the legal representation, to-wit, pleadings, discovery, court appearances, etc. Rather, we meant only that consideration of the quality factor should relate to the overall conduct of the specific case before the court, to-wit, "that particular work", "that given activity" for which the fee is awarded. *See also* Part IV C *infra.*

Finally, we underscore that once a district court determines the "lodestar" it should inquire *separately* into the contingency and quality factors, and make specific findings of fact as to each.

### B.

Under the rubric of "the contingent nature of success" the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit. The court may increase the amount established in the computation of the "lodestar" as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of:

(a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.

If, having considered the foregoing or other relevant criteria, the district court desires to increase the "lodestar" award, it should identify those factors supporting its conclusion, state the specific amount by which the basic fee should be increased due to the contingency of success, and give a brief statement of reasons therefor. We reiterate that any such increment in the "lodestar" award is to be considered and applied apart from the evaluation of the quality of services rendered in the particular proceedings.

### C.

Under the rubric of "the quality of an attorney's work", the court should appraise the manner in which counsel discharged his or her professional responsibilities. The district court may use this factor to increase or decrease the "lodestar" calculation.

As a first principle, the court must recognize that a consideration of "quality" inheres in the "lodestar" award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed. Thus, the quality of an attorney's work *in general* is a component of the reasonably hourly rate; this aspect of "quality" is reflected in the "lodestar" and should not be utilized to augment or diminish the basic award under the rubric of "the quality of an attorney's work".

*Lindy I*, then, permits an adjustment to the "lodestar"—up or down—based on the all-round performance of counsel in the specific case: "Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good." 487 F.2d at 168. By this is meant simply that the district court may determine that the lawyer discharged the professional burden undertaken with a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates. As previously rehearsed, we do not intend that this evaluation entail a detailed analysis of the lawyer's performance in each category of services rendered. Rather, the increase or decrease reflects exceptional services only; it may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party.

In determining whether to adjust the "lodestar" for quality work or not, the district court may consider, *inter alia*:

1. The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, *i. e.*, a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, *i. e.*, permitting the court "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested . . . .." *Merola II, supra*, 515 F.2d at 168.

2. An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.

If, on the basis of the quality of services rendered, the court is persuaded that an increase or decrease in the "lodestar" is warranted, it should identify those factors supporting its conclusions, state the specific amount by which the basic fee should be altered due to the quality of work, and give a brief statement of reasons therefor.

### D.

Because we view the foregoing as an implementation of the *Lindy I* formulation, rather than as a modification thereof, we will require that it be employed only for those fee applications not already adjudicated in the district courts. Moreover, in the interest of terminating the lengthy proceedings at bar—now in their fifth year—we will not require the district court here to reconsider its determination. Although we do not disturb the district court's treatment of the contingency and quality factors, it should be apparent that we do not necessarily endorse the methods or the reasoning employed to reach its result.

Henceforth, awards of equitable fund attorneys' fees should be made in accordance with the guidelines of *Lindy I* as refined and implemented today. If these guidelines are followed, we will review such awards only for abuse, or misuse, of discretion.

### V.

We turn now to the question of determining what portion of the fee award, set in accordance with the *Lindy I* criteria, the unrepresented class members should bear.[12]

---

12. Appellees appear to argue that we may not review the allocation of the fee award because "[n]o appeal was taken by anyone from that allocation of counsel fees by the court below." Supplemental Brief for Appellees at 2. We reject this argument. The Notice of Appeal was from the district court's order awarding attorneys' fees in the amount of $925,968.61 from that portion of the settlement fund payable to unrepresented claimants. Our review encompasses that total award and all issues subsumed therein.

Appellees also appear to argue that the district court's initial attorneys' fee decision ordered that category 3 claimants pay the total amount awarded from the fund, that no appeal was taken from that decision, and that we, therefore, are precluded from reviewing the al-

## A. Allocating the Award

We take as a starting point the settled principle that passive members of a class who "accepted the fruits" of the labors of others are obligated to contribute to the attorney for the active members who created the fund. *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 127, 5 S.Ct. 387, 28 L.Ed.2d 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881). "Absent extraordinary circumstances, the unrepresented claimants should pay for the attorneys' services in proportion to their benefit from them—that is, the unrepresented claimants should pay a percentage of the reasonable value of the attorneys' services to the class equal to their percentage of the class' recovery." *Lindy I, supra*, 487 F.2d at 169. With these guidelines, the district court began its analysis of the allocation problem:

> For purposes of making [the] determination in this case, the entire settlement fund must be divided into three separate categories.[27] The corrected total number of units in the settlement (excluding claims against Celotex only) is now 2,704,329. The three categories of the settlement fund are as follows:
>
> 1. The claims of those litigants represented by petitioners Kohn and Berger, totaling 497,254.4 units, or 18.4% of the total fund;
>
> 2. The claims of those litigants represented by counsel other than petitioners Kohn and Berger, totaling 1,445,916.2 units, or 53.8% of the total fund; and
>
> 3. The claims of the unrepresented claimants, including those of the objec-

> 27 In their original application, petitioners divided the fund into four separate categories. However, in its earlier opinion in this case, this Court found that suggested categories 2 and 3 should be treated alike. See 341 F.Supp. at 1085–1086. Thus, the portion of the fund to be distributed to claimants represented by attorneys other than petitioners will now be treated as one category, not as two.

tors, totaling 751,158.4 units, or 27.8% of the total fund.

> Therefore, the distributions of the fund will be approximately $5,391,200 to claimants in Category 1; $15,763,400 to claimants in Category 2; and $8,145,400 to claimants in Category 3.

This Court has found that petitioners are entitled to an award of $1,134,765.45, representing reasonable compensation for the creation of a settlement fund to be distributed among all claimants. Relying on the Third Circuit's opinion in remanding this case, the objectors contend that the portion of the fee to be paid by them should be 27.8% of the total award, a sum which would amount to $315,464.80 under the determinations which this Court has made herein.

382 F.Supp. at 1025 (footnote omitted). The court, however, ordered the unrepresented claimants to pay, not 27.8 per cent of the fee, but 81.6 per cent. *Ibid.* at 1027. If we are to affirm this allocation, therefore, we must be able to find "extraordinary circumstances".

The essence of the district court's implicit finding of extraordinary circumstances appears to have been its concern that the unrepresented claimants would contribute a disproportionately small percentage of their settlement recoveries to attorneys. That is, if the unrepresented claimants paid only their aliquot share of the equitable fund award—27.8 per cent of $1,134,765.45 or $315,464.80—they would be paying only 3.87 per cent of their settlement recoveries to attorneys. By contrast, claimants in category 1 had contracted to pay their attorneys contingency fees of 33⅓ per cent of any recovery, and claimants in category 2 had contingency agreements calling for payments of 20 to 40 per cent of their recoveries. *Ibid.* at 1025.

We believe the district court's concern was misplaced.[13] The court should not have

location. *Ibid.* at 2–3. This contention borders on the frivolous. In *Lindy I*, we vacated the order granting attorneys' fees. Nothing of the prior district court disposition remained. Accordingly, we proceed to the allocation issue.

13. Even under the district court's "equitable" theory, *see* p. 120 *infra*, category 3 claimants would be required to contribute only 11.37 per cent of their settlement recoveries to attorneys, whereas some category 2 claimants would pay

mixed considerations of the fee determined by equitable principles (the equitable fund award) with considerations of the fees dependent on private contracts. The fee with which the court was concerned is a child of equity—not of express contract. The task before the court was to determine the fee *from the fund* to which Kohn and Berger, having rendered services that benefited all members of the settlement class, were entitled on the basis of quantum meruit. Once that fee was determined, the general rule is that it be allocated pro rata among the claimants. Private arrangements individual members of the class may have with counsel are simply irrelevant. Were the rule otherwise, "extraordinary circumstances" would seem to inhere in each class action that results in an equitable fund from which an award of attorneys' fees may be made. This is not what we had in mind in *Lindy I*—when we reserved a limited exception to the general allocation rule.[14]

### B. "Equitable Set-Off"

 In concluding that category 3 claimants should pay 81.6 per cent of the applicable award, the district court followed a circuitous route. The first signpost was the observation: "[P]etitioners quite properly recognized that no additional fees should be charged against their clients, who will be paying petitioners $861,191 under the contingent fee agreements in effect. Moreover, this Court has previously ruled that none of the other litigants should be required to pay any additional fees beyond what they have agreed to pay their own

attorneys as much as 40 per cent of their recoveries. Thus, the district court's solution was only marginally effective.

14. Indeed, it would seem that one who commences a class action by retaining an attorney on a contingent basis bargains for just the type of inequity with which the district court was concerned. Although private contingent fees are frequently utilized in this type of litigation, nothing prevents the parties from agreeing to other private fee arrangements, *e. g.*, a fee in an amount that would be considered fair and reasonable by the court.

15. At argument, appellee Kohn conceded there was "little" basis in the record for the court's conclusion.

attorneys in this litigation." *Ibid.* at 1025–26. Under normal circumstances, the court reasoned, appellees Kohn and Berger could recover 53.8 per cent of the applicable award from category 2 claimants, for the benefits the attorneys conferred on them. Attorneys representing category 2 claimants, however, had also performed services benefiting the fund, including category 3 claimants, and, accordingly, had a theoretical quantum meruit right of action for attorneys' fees against the category 3 claimants. The court then employed a device—styled "equitable set-off"—whereby it ordered category 3 members to pay 53.8 per cent of the award directly to appellees, rather than requiring that Kohn and Berger seek that amount from category 2 claimants, who might then seek to recover the like amount from category 3 claimants.

Whatever merit this equitable set-off device might have in the abstract, we hold that the district court erred in applying it to this case. The court "conclude[d] that the value of the benefits conferred on the unrepresented claimants by the many attorneys who represented litigants in Category 2 and who contributed to the creation of the settlement fund [was] *at least $610,503.81*." *Ibid.* at 1028 (emphasis added). We find the record devoid of the type of evidence necessary since *Lindy I* to support an award of attorneys' fees (or their set-off).[15] There were no affidavits, no stipulations, no testimony adduced at a hearing to substantiate this evaluation. *See Estien v. Christian*, 507 F.2d 61, 64 (3d Cir. 1975).[16]

16. The only support for the district court's perfunctory assessment was the *claims* for attorneys' fees from the fund filed by other counsel. *Lindy I* should have put to rest for all time the propriety of relying on such indicia. In any event, the district court's first attorney fee decision denied all other claims for attorneys' fees. Only one attorney group appealed from that decision; we vacated that denial, *Lindy I, supra*, 487 F.2d at 170; that application was thereafter withdrawn and the claim "dismissed with prejudice". Att. at 575–76.

### C. Adequate Compensation

▮ Nor can we accept as an "extraordinary circumstance" the district court's concern that Kohn and Berger would not be adequately compensated unless the 53.8 per cent usually allocable to category 2 claimants were added to the 27.8 per cent chargeable to category 3 claimants. Without determining whether the total amount of attorney compensation from private agreements and equitable fund awards is a valid consideration in setting an equitable fund fee, we note that in the peculiar circumstances of this case, the actual total compensation to the Kohn and Berger firms will bear an uncanny resemblance to the total amount laboriously calculated by the district court.

Accepting as a starting point the district court's gross award from the fund of $1,134,765.45, and deducting therefrom the sums of $29,806.25, $320 and $40,654 as more particularly set forth in Part II, *supra*, we conclude that the appellees were entitled to an award of $1,063,985.20 from *all* members of the settlement class. The district court concluded that claimants of categories 1 and 2 should shoulder no part of this burden. The propriety of that ruling is not before us. We have found no extraordinary circumstances justifying departure from the general rule of pro rata allocation; accordingly, category 3 claimants should pay 27.8 per cent of the equitable fund attorneys' fee award—or $295,-787.88. Consequently, the Kohn and Berger firms will receive total fees of $1,156,978.88 —including $861,191 under private contingent agreements. The district court's concern that they be adequately compensated should be satisfied completely, for their total compensation will exceed by $22,213.43 the "final award" of the district court, *see* 382 F.Supp. at 1024, and by $546,929.03 the district court's "lodestar" calculation, *see ibid.* at 1014, which "constitute[s] reasonable compensation" for services rendered,

*Lindy I, supra,* 487 F.2d at 168, exclusive of quality and contingency factors.

In the circumstances of this case, we perceive no basis for finding that the benefits conferred on the category 3 claimants exceeded the proportional benefits conferred on the claimants in categories 1 and 2. We have previously indicated that the considerations which appear to have influenced the district court's deviation from the general rule of pro rata allocation do not rise to the requisite level of "extraordinary circumstances". Accordingly, we hold that the district court erred in departing from the general rule of pro rata allocation.

### VI.

Two additional contentions, neither of which need detain us long, remain for consideration.

▮ First, appellants urge that the district court erred in awarding $10,000 for "future time". The court arrived at this award by multiplying the estimated 100 hours of additional work that remained to wind up settlement administration by the $100 rate applicable to attorney Fine, appellee Kohn's partner. The court found that the estimate upon which it based the award was "reasonable". 382 F.Supp. at 1023. It did so only after hearing testimony. *See* App. at 1142–43. Having reviewed the record, we cannot say that this finding was clearly erroneous, *Krasnov v. Dinan, supra,* and we will not upset the award. Rather, we defer to the district judge "who was there". *See* n.11 *supra.*

▮ Second, appellees urge that they are entitled to interest on the fee award from the date of the district court's 1972 award. This argument is frivolous. *Lindy I* vacated the original attorneys' fee award. *See* n.12 *supra.* Consequently, there was no predicate award upon which to base interest. Moreover, because of the result reached herein, category 3 claimants will pay less to the Kohn and Berger firms than

Because of the view we take, we need not reach appellants' argument that there is no basis in law for the equitable set-off theory, either because appellees waived any potential

claims against category 2 claimants for attorneys' fees or because any potential claims by counsel for category 2 claimants for equitable fund counsel fees would now be time-barred.

the $473,712.01 which was paid to appellees on December 13, 1972, out of the first distribution made pursuant to settlement order No. 41. *See* App. at 1009.

## VII.

We conclude as follows:

1. We reverse the district court's award of $29,806.25 for fee application work prior to March 20, 1974, the award of $40,654 for work after March 20, 1974, and the award of $320 for fee application work by paraprofessionals and law students.

2. We find that the appropriate award to appellees from the settlement fund chargeable to *all* members of the settlement class was $1,063,985.20.

3. Category 3 claimants should pay 27.8 per cent of the equitable fund attorneys' fee award instead of 81.6 per cent as ordered by the district court. Based on an award of $1,063,985.20, this would amount to $295,787.88 instead of $925,968.61 as ordered by the district court.

The judgment of the district court will be vacated and the proceedings remanded for entry of an appropriate order in accordance with the foregoing.

Each party to bear his own costs.

GIBBONS, Circuit Judge (concurring in part and dissenting in part with whom SEITZ, Chief Judge, joins).

I join in Part IIA (fee litigation time), Part V (proportion assessed against unrepresented class members) and Part VI (future time) of Judge Aldisert's opinion for the court, and in his conclusions insofar as they are supported by the analysis in those parts of the opinion. I also concur in Part I (Berger fee) of that opinion, although the compensability of time spent by the Berger firm on this case is a close question under

the time-keeping rule recently announced by Chief Judge Seitz in *In re Meade Land & Development Co.*, 527 F.2d 280 (3d Cir. 1975).[1] Since I do not agree with the majority's treatment in Part IIB (intervention time) or Part III (double award for contingency and quality), I cannot join in the majority's conclusions to the extent that they depend on those parts of the opinion. I approve the refinements of the *Lindy Brothers I* standards set forth in Parts IVA, B and C, but I believe that they were actually mandated by our prior opinion. Since these standards were disregarded by the district court, I dissent from Judge Aldisert's holding in Part IVD that they should not be applied to this case.

## I. INTERVENTIONS

The district court found as fact that the Kohn and Berger firm together spent 181.-20 hours arranging for the intervention of other parties into the litigation.[2] I accept this finding. The district court then determined that these efforts had materially benefited the recovery class and thus were compensable from the settlement fund because the injection of "substantial national firms" into the litigation "afforded broad geographical representation to the class" and enhanced the likelihood of class action certification, thereby increasing pressure on defendants to settle.[3] In the circumstances of this case, I perceive no such benefit.

In October, 1966 the United States obtained criminal indictments in the Western District of Pennsylvania charging the plumbing fixture manufacturers with a horizontal price-fixing conspiracy in violation of the Sherman Anti-Trust Act. Thirteen defendants pleaded nolo contendere to these criminal charges and three others were convicted in May, 1969 after a full trial. These convictions were affirmed. In

---

1. Although the Berger firm kept no daily time records, the district court found that a reconstruction was carefully and accurately done. Absent the fairly meticulous showing present in this case regarding the reliability of the reconstruction of time expended, I would not hesitate to disallow all or part of a fee claim.

2. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 382 F.Supp. 999, 1005 (E.D.Pa.1974). The large proportion of this work was performed by the Berger firm. *See id.* at 1007.

3. *Id.* at 1013.

his opinion for the affirming court Chief Judge Seitz said: "We emphasize at the outset our conclusion that the evidence of an illegal price-fixing conspiracy is compelling." He concluded: "[T]he cumulative effect of the government's case was overwhelming." [4]

Two months after the criminal indictments were returned, Attorney Harold Kohn filed the instant class action on behalf of a national class of builder-owners allegedly damaged by the price-fixing scheme. Several hundred other civil actions raising similar issues were commenced throughout the country, all of which the Judicial Panel on Multidistrict Litigation transferred to the Eastern District of Pennsylvania. [5] Although not all of the 370 cases consolidated in the Eastern District of Pennsylvania fell in the builder-owner class involved in this settlement and litigation, this class was by far the largest. [6]

As Judge Aldisert points out, [7] the settlement for the builder-owner class was finalized before there was a formal and final class certification. The district court evidently attached great significance to this fact in assessing the extent to which the class benefited from the work on interventions. The district court cites one case [8] where national class certification was denied because the court was not satisfied that the financial strength of the petitioning representative was sufficient to conduct a protracted litigation. The district court apparently viewed the certifiability of the builder-owner class in this case with some apprehension. I do not share that concern.

It was perfectly clear from the beginning that this case, had it gone to trial, would have proceeded as a Rule 23 class action. The district court acknowledged in its initial fee determination that the plumbing fixture antitrust litigation involved the largest number of cases consolidated in a single district by the Judicial Panel on Multidistrict Litigation. [9] Kohn's complaint was filed as a class action. The district court recognized the desirability of class action treatment, for it established a temporary class of plaintiffs and designated Kohn's clients as their temporary representative. [10] The district court's concern with plaintiffs' financial strength is misplaced. *P.D.Q. Inc. v. Nissan Motor Corp. in America,* 61 F.R.D. 372 (S.D.Fla.1973), upon which the district court relies, is quite dissimilar to this case. There the district court refused to certify two plaintiffs in an antitrust action as class representatives for all purchasers of Datsun automobile from 1968 to 1972. The prospective class numbered in excess of 600,000 and the court felt that two individual representatives had inadequate resources to provide notice, to finance the litigation and otherwise protect the interests of class members. Here, however, the class is not individual purchasers but builder-owners; moreover, the vast number of suits filed is itself testimony to the financial power of the litigation class. [11]

In the context of this appeal, the absence of a formal and final class certification is of no consequence in determining the compensability of attorney time spent on plaintiff interventions. As pointed out both by

---

4. *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 182, 207 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971).

5. *In re Plumbing Fixtures,* 295 F.Supp. 33 (Jud. Panel Multidst.Lit.1968).

6. In contrast to the $24,000,000 settlement negotiated for the builder-owner class, a $1,000,-000 settlement was approved for the wholesaler class and a $2,000,000 settlement for the contractor class. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 341 F.Supp. 1077, 1079–80 (E.D.Pa. 1972), *rev'd,* 487 F.2d 161 (3d Cir. 1973).

7. Majority opinion at 112.

8. *P.D.Q. Inc. v. Nissan Motor Corp. in America,* 61 F.R.D. 372 (S.D.Fla.1973).

9. 341 F.Supp. at 1079.

10. *Id.* at 1080.

11. The builder-owner class includes among many others: Lefrak Organization, Hilton Hotel Corporation, Loew's Theatre and Realty Company, and Humble Oil & Refining Company.

Chief Judge Seitz in *Lindy Brothers I*[12] and Judge Aldisert in the majority opinion, the action for attorney's fees in common fund cases is grounded in quantum meruit. The touchstone for the compensability of services rendered is benefit to the class. Since this case would undoubtedly have proceeded to trial as a class action, and since the plaintiffs who did not opt out would be finally bound by a judgment, they all had a compelling incentive for vigorous prosecution irrespective of their status as named class representative or unnamed class member. Berger concedes that after the 1966 amendments to Rule 23 intervention in cases like this one is not essential to protect or promote a client interest.[13] And although after those amendments intervention is still permissible, when the class is already represented *in fact* by a class representative able to procure the services of an attorney of the skill and vigor of Kohn, intervention seems to me to be an essentially meaningless ritual.

Judge Aldisert urges that the district court's conclusion that the presence of Berger's clients as plaintiffs in the case added weight to the in terrorem effect of the lawsuit and concomitantly to the pressure to strike a settlement, is a finding of fact which we cannot disturb under Rule 52(a). If that finding is intended as a determination that Berger's presence as a representative of class members did in fact operate to produce a more favorable or more prompt settlement, on this record the finding is totally devoid of evidentiary support.[14] Although by invoking the "clearly erroneous" standard of review an appellate court can adorn an affirmance of a factual finding below with an aura of respectability, that does not make the affirmance necessarily correct. I believe that the majority has abdicated even its nominal appellate function in this instance. There is no evidence whatsoever in the record to substantiate the district court's bald declaration that the presence of Kohn and Berger as attorneys for intervenors rather than as attorneys for class members had any effect upon the defendants' decision to settle. The district court allowed, and the majority has affirmed, compensation from the unrepresented class members for services in seeking to intervene, on the theory that as a matter of law such services will be presumed to be class-benefiting. Such a presumption is inconsistent with the intended purpose of the class action procedural device and with the patent realities of the litigation in this case.

Intervention is a practice that has insinuated its way to the procedural bone of massive class action cases of this kind.[15] At its best intervention by appropriate parties may broaden the plaintiffs' financial base, fortify their resolve, and conduce to and quicken settlement. At its worst, indiscriminate intervention will protract a litigation, produce much duplication of effort, and if compensated, fritter away the precious recovery fund. Judge Wyatt of the Southern District of New York has taken what seems to be the first step toward curbing abuse of the practice by denying Berger and Kohn compensation for intervention work performed in connection with the massive antibiotic industry antitrust suit settled in his court. In denying the fee request Judge Wyatt observed: "As to such attempted interventions, hours spent in such work, whether by the Berger firm or the Kohn firm, ought to be disregarded

---

**12.** 487 F.2d at 165.

**13.** Berger's deposition testimony is to the effect that such intervention work was "customary." One member of Berger's firm testified as follows concerning intervention work performed in the case:

We were able to establish standard forms of intervention. Often we would collect up a number of them before filing a motion for intervention so that several intervenors would be part of a single motion for intervention.

\* \* \* \* \* \*

My best recollection is that it was certainly in excess of 500 and maybe even closer to 1000 or more individual intervenors.
Brief for Appellants at 32.

**14.** *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972).

**15.** *See* note 13 *supra*.

because there was never any reason for it . . . ."[16]

I do not mean to suggest that the compensability of time spent preparing interventions can easily be determined by reference to hard-and-fast rules. In the case of non-class litigation the intervention of a prominent or powerful party may materially contribute to the creation of a benefit common to all plaintiffs, making recovery in quantum meruit appropriate. Whether this is indeed the case must be determined in the first instance by the trial court. I believe, however, that this inquiry should be a searching one, and the inference of benefit not casually drawn.

With respect to class action litigation, the court's responsibility is not markedly different, although I believe the problem is more susceptible to judicial rule-making. Although the majority reserves decision on the point, I can envisage no situation where intervention occurring after a class certification will benefit the class in any compensable fashion. Judge Aldisert recognizes that certification pursuant to Rule 23 contemplates fair and adequate representation of all class interests, and I cannot see how intervention by a party who will in any event be bound by a judgment will impel more vigorous prosecution of the claim or intimidate a potentially liable defendant into settling on terms favorable to the class.

Where, as here, a settlement is reached before a formal certification is made, the district court must engage its talents in realistically appraising the value to the class of plaintiff interventions. The pivotal inquiry is not whether the interventions contribute to the settlement; rather it is whether absent intervention class certification is likely. If a settlement is inevitable after the class is certified, time spent on intervention should not necessarily be deemed beneficial to the class simply because the intervention accelerates an otherwise foreordained result. In this case I think it plain that Berger's and Kohn's efforts had no in terrorem effect because class certification was certain. Accordingly, I feel constrained to disallow from the fee computation the 181.20 hours spent by their firms in pursuing interventions.

## II. DOUBLE AWARD FOR CONTINGENCY AND QUALITY OF REPRESENTATION

In computing the fee award the district court doubled the hourly rate of compensation found to be reasonable for the services in question in nine categories of work.[17] This doubling was performed in the expressed belief that the contingent nature of the lawsuit and the unusual quality of the services rendered warranted compensation one hundred percent higher than the assigned reasonable hourly time rates.[18] In doing so the district court acted inconsistently with both the letter and the spirit of the law of the case announced in *Lindy Brothers I.* I dissent from the majority's acquiescence in this thinly-veiled end-run around our prior opinion. The case is old, but appellate judges cannot operate on the premise that what was unacceptable on the first appeal becomes palatable by attrition.

Before turning to my understanding of the law of this case one of the nine time categories—intervention—requires separate treatment. Since in Part I above I conclude that the 181.20 hours in this category conferred no benefit on the class, obviously I conclude that the $26,170.00 at which this time was valued should not have been doubled to $52,340.00.

16. *City of Philadelphia v. Chas. Pfizer & Co.,* 345 F.Supp. 454, 484 (S.D.N.Y.1972).

17. The court assigned a reasonable hourly rate of compensation for each attorney in the Kohn and Berger firms who worked on the case, "taking into account each attorney's legal reputation and his status as a senior partner, junior partner or associate." 382 F.Supp. at 1005, citing *Lindy Brothers I,* 487 F.2d at 167. The reasonable fee for Kohn and Berger was determined to be $125/hour. Certain senior partners were compensated at a rate of $100/hour. The lowest reasonable fee for associates' time was determined to be $35/hour. *See* 382 F.Supp. at 1005–06.

18. 382 F.Supp. at 1023–24.

The eight other time categories which were doubled—pleadings, discovery, court appearances, settlement, settlement administration, briefs and legal research, general matters, and other appellate proceedings—all did, in my view, benefit the class. Whether the reasonable hourly rates for time spent in each of these categories should have been doubled, however, is another matter entirely.

In *Lindy Brothers I* we said:

"While the amount thus found [on the basis of time] to constitute reasonable compensation should be the lodestar of the court's fee determination, there are at least two other factors that must be taken into account in computing the value of attorneys' services. The first of these is the contingent nature of success.

. . . . .

The second additional factor . . . is the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled. . . . The value to be placed on these additional factors will, of course, vary from case to case. *Often, however, their value will bear a reasonable relationship to the aggregate hourly compensation.*" 487 F.2d 168–69 (emphasis supplied).

The question, then, is whether a valuation of the contingency and quality factors in this case at one hundred per cent of the reasonable value of the services performed bears a reasonable or a totally unreasonable relationship to that value. It seems clear to me that the district court, bent on justifying a calculation which in the aggregate produced almost the identical numerical to-

tal we had previously reversed,[19] arbitrarily selected a multiplication factor of one hundred per cent without really analyzing the factors which in *Lindy Brothers I* we said should govern disposition of the fee question. Judge Aldisert's analysis in Parts IIA and V of the majority opinion corrects the district court's arbitrary calculations in substantial measure. But we have the same obligation respecting the entire case. Such appellate deference to an arbitrary and unexplained selection of a one hundred per cent quality and contingency factor is the seed which may bear fruit in the undermining of the significant advance in the law which *Lindy Brothers I* heralded.[20] For if the district courts can pull contingency and quality multipliers out of thin air, calculating the reasonable value of an attorney's time as a measure of the quantum meruit for his services to unrepresented class members will soon become a meaningless rite. Then the reasonable value of the attorney's time will soon become a lodestar leading in no certain direction, a compass without a card, and fee awards in class actions will be as standardless as before we acted to rationalize the process. Obviously, the majority is concerned that this danger exists and recognizes the need for the application of objective criteria in Parts IVA, B and C of the opinion of the court. But I am at a loss to understand why those criteria should not be applied to this case.

### A. *Contingency.*

In discussing the contingency factor in *Lindy Brothers I* Chief Judge Seitz wrote:

In assessing the extent to which the attorney's compensation should be increased to reflect the unlikelihood of success, the district court should consider

---

**19.** The attorney's fee award which we vacated in *Lindy Brothers I* totaled $1,374,655. 341 F.Supp. at 1090. On remand the district court determined the hourly-based reasonable value of Kohn's and Berger's services to be $524,-715.60 which when doubled totaled $1,049,-431.20. The addition of other non-doubled time (e. g., future time, fee time and para-professional time) increased the final fee award to $1,134,765.45. *See* 382 F.Supp. at 1024.

**20.** I note with satisfaction that at least two courts of appeals have followed our lead in *Lindy Brothers I* in an effort to curb excessive awards of attorney's fees in class action litigation. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). *Cf. National Treasury Employees Union v. Nixon*, 172 U.S.App.D.C. 217, 521 F.2d 317 (1975).

any information that may help to establish the probability of success. The most important such information in a civil antitrust suit may be the progress of any criminal action brought against the defendants. Here, the United States had obtained indictments against all the defendants before the civil suits were filed; the defendants who pleaded not guilty had been convicted before serious settlement negotiations were begun; and those convictions were affirmed before the court gave final approval to the settlement. The *court may find that the contingency was so slight* or the amount found to constitute reasonable compensation for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal.

487 F.2d at 168 (emphasis supplied; footnote omitted).

The district court correctly held that the reasonable value of the attorney's services was not so large a proportion of the total recovery as to preclude an increased allowance on that ground.[21] And although the district court acknowledged the relevance of the other factor—the magnitude of the contingency in this case is positive proof that compliance with our prior mandate was in form but not in substance.

In the first place, the district court, in concluding that a doubling of the reasonable time-based fee was appropriate under the circumstances, made no effort to allo-cate proportions of the fee increase between the quality and contingency factors.[22] In Part IVA the majority says:

Finally, we underscore that once a district court determines the "lodestar" it should inquire *separately* in the contingency and quality factors, and make specific findings of fact as to each.[23]

Patently, this was not done in this case. I am at a complete loss to understand how the majority can affirm the doubling here. We know that the mark-up totaled one hundred per cent, but we can only speculate whether the district court weighed the contingency factor at one per cent or ninety-nine per cent. At a minimum, *Lindy Brothers I* must be read, and the majority so reads it, as requiring the district court to state with some degree of precision the multiplication factors individually attributable to the quality and contingency criteria.

In the second place, the district court's effort to distinguish away the significance of the factors to which Chief Judge Seitz, discussing contingency, made specific reference is disingenuous. The opinion refers to the uncertainty of the class members' ability to prove liability and damages. This is a price-fixing conspiracy case. The defendants some of whom pleaded nolo contendere and others of whom pleaded guilty, are sellers of plumbing fixtures. The plaintiff class of builder-owners are purchasers for use of plumbing fixtures. The contingency respecting the existence of the conspiracy to fix prices was virtually nil.[24] If there

---

**21.** The time-based value of services amounted to only 2% of the settlement fund.

**22.** 382 F.Supp. at 1024. The court's conclusion was simply stated:

[T]his court finds and concludes that . . . the . . . amounts determined on the basis of a reasonable hourly rate should be doubled because of the contingency and quality factors discussed hereinabove.
*Id.*

**23.** Majority opinion at 117 (emphasis in original).

**24.** In arguing to the contrary appellees quote the following paragraph of Chief Judge Seitz's opinion in *Lindy Brothers I*:

The threshold issue in antitrust cases is the defendant's violation of the antitrust laws. If the defendant in a criminal antitrust action is convicted after a plea of not guilty, the criminal conviction is prima facie evidence of violation of the antitrust laws. 15 U.S.C. § 16 (1970). We recognize that convictions following pleas of nolo contendere are not entitled to the same evidentiary position as convictions following not guilty pleas and that even where violation of the antitrust laws is established, civil plaintiffs must prove that they were injured by the violation.
487 F.2d at 168 n.12.

With respect to the three firms that were convicted of price-fixing at trial, a finding of civil liability was all but certain. Apart from plaintiffs' ability in a civil action to replicate the proof of wrongdoing that established guilt beyond a reasonable doubt in the criminal proceeding, plaintiffs might have been able to in-

were overcharges and the plaintiffs paid them they were injured in their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. The only speculative element was whether overcharges resulted from the conspiracy, and if so, how much. Since I have never heard of a price-fixing conspiracy aimed at reducing prices to consumers I cannot take seriously the contention that the existence of overcharges involved· a significantly speculative element in the case. Some recovery was virtually certain; what speculative element there was related to the amount, not the probability, of potential recovery.

When *Lindy Brothers I* was written it was as obvious as it is now that the amount of potentially recoverable damages was not certain. But Chief Judge Seitz did not advert to the certainty of proving damages, as opposed to the certainty of proving liability, in discussing the element of contingency. I do not say that he excluded that factor as irrelevant. I do say that in a case where some recovery is virtually certain, the fact that the total recovery may be uncertain cannot, consistent with the spirit of *Lindy Brothers I*, justify a substantial departure from the lodestar of reasonable value of services computed on a time basis.

In an attempt to fortify the district court's feeble analysis of the contingency question, Judge Aldisert interjects a factor the relevance of which escapes me. The majority opinion says:

> Moreover, at the outset of the civil litigation, defendants challenged the propriety of a national class action on the ground that it was unmanageable.[25]

The certifiability of a proposed class action is a contingency factor, certainly. But it is not the kind of contingency to which *Lindy Brothers I* refers. If the class action manageability determination had excluded the unrepresented builder-owners they· would not have benefited from the attorney services and the attorneys could not recover on a quantum meruit basis from the builder-owners' proportion of any recovery fund. That these attorneys rather than some others in another lawsuit represented the builder-owners in no way increased the value of the instant services to them. The contingency factor to which *Lindy Brothers I* refers is the probability of success in the lawsuit, not the probability of success in enlarging the class so as to maximize the fee.

Finally, I search in vain for the place in the record where the district court, having considered the relevant criteria bearing on contingency, "identif[ied] those factors supporting its conclusion, state[d] the specific amount by which the basic fee should be increased due to the contingency of success, and [gave] a brief statement of reasons therefor."[26] I agree that an appellate court may find "an abuse, or more accurately a 'misuse', of discretion where the trial court utilizes improper standards or procedures in determining fees."[27] A comparison of the district court opinion with Part IVB of the majority opinion is all that is required to conclude that an "abuse" or "misuse" of discretion took place with respect to the contingency factor.

## B. *The Quality Factor*

The majority opinion in Part IVB makes explicit what was certainly implicit in *Lindy Brothers I* and what was previously explicated by Chief Judge Seitz in *Merola v.*

---

voke collateral estoppel. *See generally*, Note, Section 5(a) of the Clayton Act and Offensive Collateral Estoppel in Antitrust Damage Actions, 85 Yale L.J. 541 (1976). And to say that a plea of nolo contendere is not entitled to the same evidentiary weight as a conviction or guilty plea is not to say that civil liability cannot be proved, or even that such proof will be difficult. After all, in affirming the criminal convictions of the three defendants that went to trial, Chief Judge Seitz remarked that "the cumulative effect of the Government's case was overwhelming." *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 207 (3d Cir. 1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971).

**25.** Majority opinion at 113.

**26.** *Id.* at 117.

**27.** *Id.* at 116.

*Atlantic Richfield Co.,* 515 F.2d 165, 168–69 (3d Cir. 1975). The quality factor deals with superior representation that produces a highly favorable result in an atypically short time, or with inferior representation that produces a pedestrian result with the meter running. This factor simply is not implicated in what I believe are the large majority of fee calculations where quality representation is amply rewarded at hourly rates reflecting counsel's experience and stature at the bar.[28] As with the contingency factor, the majority indicates that the district court should identify those factors supporting its conclusion that the fee should be increased or decreased due to quality of the work.[29] But in this case the district court made no real effort to consider the functional interrelationship between time and result accomplished. That was error, since it leaves us entirely in the dark as to the district court's evaluation of the efficiency of representation. That mistake compounds the district court's failure to separate the contingency and quality determinations.

Part III of Judge Aldisert's opinion refers to two "findings" of the district court which are characterized as not clearly erroneous and which are apparently offered in support of the conclusion that the quality of representation in this case merited a substantial (but nowhere quantified) increase in the basic fee.[30] The first of these "findings" is that this was a massive lawsuit. It was indeed. But its size is reflected in the number of hours devoted to it. For example, in arriving at the total fee to be doubled the district court included the reasona-

ble value of 939.25 hours in a category called "settlement administration," which includes 100 hours of future time at $100.00 an hour. Obviously, as membership in the class increases the paperwork of administering a distribution of a settlement increases. But unless it can be shown (and it has not) that by virtue of the increase the unit cost of distributing the settlement to each class member decreased, it cannot be said that the quality of the attorneys' work in this category was unusually beneficial. Absent *unusually* beneficial services the lodestar of reasonable value on time basis should control. The finding of complexity in the lawsuit is not relevant to the benefit conferred.

Another "finding" relates to the conduct of the lawsuit. The district court concluded that the total time spent by petitioners in this case is relatively low when one considers the results accomplished.[31] Here, at least, the district court dealt with the relationship between quality and benefit. But I do not accept Judge Aldisert's position that our review of the district court's evaluation of efficiency and accomplishment is confined to the clearly erroneous standard. Rather, as Part IVB of his opinion amply demonstrates, we must endeavor to consider whether the district court made any serious effort to justify its conclusion by reference to materials in the record and discernible standards of comparison.

### C. *The Majority's Inconsistency*

The patent inconsistency between Part III and Parts IVA, B and C of the majority opinion is explained in Part IVD. Because

---

28. *See* note 17 *supra.*

29. Majority opinion at 118.

30. *Id.* at 115–116.

31. 382 F.Supp. at 1021–22. The district court's entire discussion of this difficult question was as follows:

 From a review of these written materials and from personal observations, this Court concludes that petitioners have exhibited an unusual degree of skill in conducting these proceedings. They were aggressive and imaginative throughout. Because the work has been efficient and of an atypical quality, the aggregate hourly compensation should be increased. Indeed, the total amount of time spent by petitioners in this case is relatively low when one considers what was accomplished and the number of years that have elapsed since the litigation was commenced. Certainly, economy of effort should not be penalized. Less experienced and less skillful attorneys would undoubtedly have expended much more time in achieving the same result than did petitioners. *Id.* at 1022.

this case is now five years old, "we will not require the district court to reconsider its determination,"[32] even though it did not comply with our prior mandate. This kind of appellate performance can best be ascribed to the "déjà vu" or "fatigue" school of jurisprudence. It reflects, I am sure, the pragmatism of appellate judges who overwhelmed by the caseload, yield to the temptation of affording undue deference to the initial decisionmaker. A further manifestation of the tendency is the favorable citation of Judge Smith's baseball analogy,[33] an analogy that I find singularly inapt when applied to appellate review. After the third out in the ninth inning the baseball game is over. But the provision for appellate courts means that the game of litigation is, or at least should be, played by different rules. In *Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 295 (3d Cir. 1974), Judge Garth stated our role in the following terms:

> "It is well-settled that the awarding of attorneys' fees is a matter of discretion for the district court. *See Tranberg v. Tranberg*, 456 F.2d 173, 175 (3d Cir. 1973). In applying this limited standard, however, this Court will scrutinize conclusions of law and findings of fact (upon which the award is based) according to traditional precepts. Where a District Court errs as a matter of law by utilizing improper standards or procedures in determining fees, an abuse of discretion occurs. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, supra, 487 F.2d at 166. Similarly, clearly erroneous findings of fact require reversal."

*Accord, In re Meade Land & Development Co.*, supra, 527 F.2d at 283–84. I have no stronger desire than Judge Aldisert to engage in endurance contests with district courts, but if the rule of law is to be preserved, our stamina must be equal to theirs. Reversible error has once again been committed below, and I believe that we are duty-bound to grant relief from that error.

The most pernicious manifestation of the majority's tendency to avoid judging in this case—which I suggest threatens the very institution of appellate review for error—is its announcement that we are going to shield ourselves in advance from the consideration of similar errors which may have occurred in fee applications already adjudicated but not yet reviewed.[34] What source, other than the "fatigue" factor, is there for our authority, as an intermediate court charged with review for error as of right, to adjudicate in this case the rights of litigants not before us? Certainly Parts IVA, B and C of Judge Aldisert's opinion announce no new principles. *Compare Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Recognizing that mathematical precision in applying the standards established in *Lindy Brothers I* and the decision today is neither possible nor necessary, something more than was done here is required. This court has an obligation to correct the procedural error below. *Merola v. Atlantic Richfield Co., supra; In re Meade Land & Development Co., supra.* We should not shirk that obligation in this or any other case for the sake of closing the file.

### CONCLUSION

Examining the record in which the district court acted, I am inclined to agree that the settlement of $10.75 per bathroom unit sold during the term of the price-fixing conspiracy was a favorable one, negotiated with the expenditure of a quite reasonable amount of time. But I have no idea what weight the district court gave to this factor in arriving at its one hundred per cent markup. I am less inclined to see any

---

**32.** Majority opinion at 118.

**33.** Majority opinion at 115 n.11.

**34.** I refer to the statement:

"Because we view the foregoing as an implementation of the *Lindy I* formulation, rather than as a modification thereof, we will require that it be employed only for those fee applications not already adjudicated in the district courts." *Id.* at 118.

record support for the application of a contingency factor in any of the ranges which the majority says might have been proper. But here, as well, I have no idea what weight the district court gave to the contingency factor.

The category three claimants should pay 27.8 per cent of the equitable fund attorneys' fee determined as follows:

| | Category | Time (hours) | Reasonable Value |
|---|---|---|---|
| 1. | Pleadings | 87.00 | $ 7,205.00 |
| 2. | Discovery | 1,609.55 | 135,524.50 |
| 3. | Court Appearances | 604.65 | 60,440.00 |
| 4. | Settlement | 531.20 | 53,557.50 |
| 9. | Settlement Administration* | 939.25 | 71,218.75 |
| 10. | Briefs and Legal Research | 433.25 | 41,349.50 |
| 11. | General Matters | 1,686.33 | 150,585.35 |
| 12. | Other Appellate Proceedings | 17.50 | 1,750.00 |
| | Paraprofessional and law student time | | 4,874.00 |
| | Total Fee | | $526,504.60 |
| | | | × .278 |
| | Assessed against Category 3 claimants: | | $146,368.27 |

\* Includes 100 hours of future time at $100/hour

I would remand in No. 74–2189 with instructions to enter judgment fixing the fee to be paid from the category 3 fund at no less than $146,368.27, and with instructions to calculate the contingency and quality factors, if any, applicable to the eight attorney time categories listed above, in accordance with Parts IVA, B and C of the majority opinion. Were I applying the majority formulation I would find it difficult, indeed, to articulate a justification for a hundred per cent markup on this record.