Otis M. JORSTAD and Ethel M. Jorstad, Plaintiffs,

v.

IDS REALTY TRUST, a real estate investment trust, et al., Defendants.

Civ. No. 4-76-358.

United States District Court, D. Minnesota, Fourth Division.

March 12, 1980.

Plunkett, Schmitt & Plunkett, Austin, Minn., Popham, Haik, Schnobrich, Kaufman & Doty, Minneapolis, Minn., for plaintiffs.

Dorsey, Windhorst, Hannaford, Whitney & Halladay; O'Connor & Hannan, Minneapolis, Minn., for defendants.

## MEMORANDUM AWARDING ATTORNEYS' FEES AND EXPENSES

MILES W. LORD, District Judge.

Before the Court in this securities class action is a joint application for attorneys' fees and expenses following approval of. a settlement in behalf of debentureholders of IDS Realty Trust ("Trust"). Due to the nature of the settlement, which will be discussed later, the Court has had the benefit of a full adversary hearing on this fee application. The parties to this fee application have provided the Court with exhaustive legal memoranda. The Court conducted an evidentiary hearing over three days in which it received hundreds of pages of documentary evidence and took testimony by way of deposition, affidavits, and direct examination of expert witnesses and three of the attorneys representing the two law firms that have joined in this fee application. Each of the witnesses was rigorously cross-examined. In addition, the Court has had the opportunity to observe, first hand, the many facets of this litigation over the past three years and is in a unique position to evaluate this fee application.

## BACKGROUND

This litigation was commenced on August 10, 1976. The plaintiffs alleged that registration statements and prospectuses filed with the Securities and Exchange Commission, and used in connection with the public offering of Trust's five series of debentures, contained material misrepresentations and omissions of fact and sought rescission of the sale of the debentures or damages. The complaint specified sixteen areas of misrepresentations or omissions related to the adequacy of Trust's loss reserves and policy for establishing loss reserves, Trust's delinquent loan experience, the value of Trust's assets, the losses sustained by Trust's Adviser, the adverse conditions in the real estate industry, and the suitability of the investment. The plaintiffs asserted liability based on sections 11, 12 and 17(a) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, and the common law.

The defendants included Trust; IDS Mortgage Corporation ("IDSMC"), which was the adviser to the Trust; Investors Diversified Services, Inc. ("IDS"), which controlled the Adviser; Alleghany Corporation, principal shareholder of IDS; officers, directors and trustees of IDS and Trust; and Peat, Marwick, Mitchell & Co., Trust's certified public accountants.

On August 19, 1977, this Court certified the lawsuit as a class action on behalf of all persons who held subordinated debentures of Trust acquired through IDS as agent and underwriter for Trust, during the period from October 20, 1972, through and including October 2, 1974, ("class"). The firms of Plunkett, Schmitt & Plunkett and Popham, Haik, Schnobrich, Kaufman & Doty, were designated as co-counsel for the class. These two law firms are the applicants in this fee application.

Following extensive discovery, numerous hearings, an expedited appeal and intense settlement negotiations, on May 11, 1978, the parties to this class action presented the Court with a stipulation of settlement. Pursuant to the Court's Order of May 16, 1978, notice was sent to all of Trust's debentureholders summarizing the terms of the settlement and advising them that they could appear and express their opinion concerning the settlement at a hearing on June 23, 1978. Following that hearing, the Court entered an Order on June 26, 1978, approving the settlement as fair, reasonable and

adequate. The Court's Order approving the settlement reserved jurisdiction over the awarding of attorneys' fees and expenses to counsel for the class and also provided that a hearing regarding such fees and expenses would be held following an opportunity for full and free discovery by all parties.

THE SETTLEMENT

At the time this lawsuit was commenced, Trust had approximately $170 million in subordinated debentures outstanding; it had suspended payments to a presentment fund, which had been established for the early retirement of debentures. It was contemplating bankruptcy proceedings, and the debentures were selling between 20% and 30% of principal in a thin market.

In summary, under the settlement, Trust made a tender offer to purchase up to $65 million in principal amount of the debentures at 80% of principal, plus accrued interest. Pursuant to the tender offer, the cash payment to the debentureholders was $52 million. In order to fund the tender offer, IDS made a cash payment of $34 million and agreed to loan and guarantee loans to the Trust for the balance.

Approximately $85 million principal amount of debentures were tendered, which represented half of the debentures outstanding. The settlement provided a method for prorating in the event that more than $65 million debentures were tendered and that those not purchased in the initial tender offer could continue to be offered for sale to the Trust until September 30, 1982, under the same terms as the tender offer. The Trust was obligated to use its best efforts to apply its excess resources to purchase those debentures at 80% plus accrued interest and to report to the debentureholders on the purchase of debentures and the source and use of its cash. At the time of the hearing on the joint fee application, Trust had purchased most of the tendered but unpurchased debentures pursuant to its continuing offer to purchase.

In addition, the settlement provided for a $6 million revolving loan commitment from IDS to the Trust by which IDS agreed that if the Trust should default on the outstanding debentures and the debentureholders received less than 100% of the principal, IDS would be at risk with them to the extent of the loan commitment. Finally, no attorneys' fees would be deducted from the $52 million available for the tender offer. Instead, the settlement provided that IDS and Trust would pay the fees and expenses awarded by a final judgment.

CAUSATION

IDS and Trust have stipulated that counsel for the class are entitled to reasonable attorneys' fees and expenses and that they have produced a benefit for the class. Nevertheless, Trust and IDS assert that the efforts of counsel for the class and desire to settle the litigation had little impact on the decision by IDS to provide financial support for the Trust or to make the tender offer to the debentureholders. IDS argues that it was motivated to provide financial assistance to Trust and arrange for the tender offer for business reasons because many of the debentureholders are good customers of IDS and, in order to protect their public image, they had to take steps to see that Trust met its obligations to the debentureholders.

The Court has reviewed hundreds of documents touching on the motives of IDS and Trust in resolving this litigation and the causal relationship between the efforts of counsel for the class and the settlement in behalf of Trust's debentureholders. The documents include correspondence and memoranda from outside and home counsel for Trust, IDS and Alleghany, minutes of meetings of the directors of Alleghany and IDS, the executive committee of IDS, the trustees, and confidential memorandums and communications among the officers and directors of those companies. Despite Trust's dire financial condition, the evidence shows that IDS recognized no obligation to protect the debentureholders prior to this litigation. IDS assistance to Trust was the minimum necessary in order to avoid bankruptcy. Even the bankruptcy of Trust was acceptable to IDS, despite the impact that would have on the debentureholders.

By 1975 Trust was in precarious financial circumstances. Trust preferred to raise more capital through the offering of another debenture series, but was forced to forego any new debenture offers and turned to its creditor banks. The banks insisted that IDS, Trust's sponsor, must make a commitment to the future of Trust before they would provide new financing. IDS minimized its financial commitment to Trust by agreeing to secure the consent of Trust's debentureholders to suspend payments by Trust to a presentment fund for the early retirement of debentures, a concession by the debentureholders that would generate approximately $13 million per year.

By July of 1976, IDS, through its sales force, had secured the necessary consent of the debentureholders to suspend presentment fund payments by Trust. In order to secure the debentureholders' consent to suspension of presentment fund payments, IDS had considered, but rejected, a guarantee of future interest payments or an extra interest payment of one-half of one percent for the debentureholders. Instead the prospect of bankruptcy of Trust was the only inducement used to secure the debentureholders' consent. The attitude of IDS toward the debentureholders is reflected in handwritten notes from a meeting on May 5, 1976, involving personnel responsible for overseeing the consent of the debentureholders to the suspension of the presentment fund payment. The notes contain the statement: "Bring people to the brink of disaster to get them to respond"; and "Reps. should not say or leave impression that IDS has guaranteed REIT obligations". In addition, IDS continued to maintain the position that Trust was a separate entity and that it had no responsibility to the debentureholders.

This litigation was commenced one month after the debentureholders had consented to the suspension of the presentment fund payments. A significant change in the attitude of IDS toward financial support for the Trust and its debentureholders began to occur thereafter. Among the documents which support the conclusion that the efforts of counsel for the class caused IDS and Trust to agree to the settlement of this litigation and the resulting benefits to Trust and its debentureholders are two opinion letters of the outside counsel of IDS and a memorandum from the president of IDS.

The two opinion letters are dated February 1977 and May 11, 1977. The former is a draft opinion submitted to the president of IDS in February 1977, and the latter was submitted to the IDS Board of Directors. The February opinion letter had been reviewed by IDS house counsel who concurred in its conclusions.[1]

The April 13, 1977, memo of the president of IDS to the IDS Executive Committee recommended that IDS offer assistance to Trust by purchasing $34 million of Trust's outstanding debentures conditioned upon settlement of the debentureholder class action suit. In the memo the president acknowledged that his recommendation was a departure from his previous position, concluding that:

> In my opinion, this proposed solution affords the maximum benefit to both the Trust and IDS as the sponsor and advisor to the Trust. It provides the best opportunity for both to reach a settlement in the class action debentureholder law suit.

In April, 1977, nine months after this litigation was commenced, the IDS Board

---

1. The defendants asserted attorney-client privilege or work product immunity with respect to these documents and others. Documents were produced pursuant to an Order of Magistrate Renner, dated February 8, 1979, which provided that production of privileged materials would not be deemed a waiver of the claimed privilege in this or in any other action or proceeding, and that such documents and their contents would not become part of the public records. Consequently, in this Memorandum, this Court has not quoted or paraphrased language from such documents but has identified the documents in question. The Court has sealed its Findings of Fact, Conclusions of Law and Order for Judgment which quotes from certain of the documents which are alleged by defendants to be privileged. The Findings, Conclusions and Order shall be sealed pending further Order of this Court or of the Eighth Circuit Court of Appeals.

of Directors authorized a plan of financial support for Trust which, after months of settlement negotiations with counsel for the class and substantial changes in its terms, culminated in the settlement which has previously been described.

The evidence presented at the hearing on this fee application leads the Court to conclude that, although business considerations may have played a part in defendants' decision to settle this litigation, the effort of counsel for the class in their diligent and resourceful representation of the debentureholders was the primary cause for the benefits secured through the stipulation of settlement entered into by the parties to this litigation and approved by this Court on June 26, 1978.

## HEARING ON PETITION

Having concluded that counsel for the class were the primary cause of the benefits produced for the class as a result of the settlement of this litigation, we turn to the determination of an appropriate fee award. The joint application seeks an award of $4,161,132 as attorneys' fees up to the approval of the settlement and $722,900 in prosecuting the fee application. In addition, it seeks reimbursement of expenses in the amount of $56,342.71 incurred up to the approval of the settlement and $63,798.69 incurred in connection with their fee application. IDS and Trust have stipulated that counsel for the class are entitled to an award for reasonable attorneys' fees and expenses, but contend they are entitled to an award only for time spent in prosecution of the litigation through approval of the settlement, and urge that a reasonable fee for the combined firms would be $364,991 plus expenses of $58,999.56.

Counsel for the class have submitted detailed time records and have segregated their time as to categories of work performed. They have also submitted an extensive affidavit setting forth a history of this litigation and their activities in connection with the case on its merits. In addition, both firms have submitted complete records of the expenses incurred in connection with the case on its merits and their fee application.

The Court also had before it the hours expended and attorneys' fees incurred by several of the defendants in the prosecution of this litigation. One of the defense firms found it necessary to estimate their hours and fees because they were unable to identify the time spent in their representation of this litigation and their work on other matters. The Court also had available to it the expenses incurred by various defendants in the prosecution of this case both on the merits and in the fee application.

A hearing was conducted on the joint application for an award of attorneys' fees and expenses. The hearing commenced on February 22, 1979, and lasted for three days. At that hearing, counsel for the class presented documentary evidence and testimony in support of their application; they provided testimony from four witnesses, one of whom was by deposition. The defendants presented documentary evidence and one witness in support of their position and cross-examined three of the attorneys who played principal roles in prosecuting this litigation on behalf of the debentureholders of Trust: Hugh v. Plunkett, III, Robert A. Minish and David S. Doty.

Homer A. Bonhiver appeared as a witness on behalf of counsel for the class. Mr. Bonhiver is a certified public accountant who has extensive experience as a receiver and trustee in bankruptcy and has, at various times, been an investigator, consultant and expert witness for governmental and law enforcement agencies. In general, Mr. Bonhiver testified as to the benefits derived from the settlement of this litigation, the causal relationship between the efforts of counsel for the class and these benefits and the quality of the work performed by counsel in this litigation. Stanley L. Kaufman and Richard W. Johnson also appeared as witnesses in support of the fee application. Mr. Kaufman is an attorney from New York and has extensive experience in the field of class action and securities litigation. Mr. Johnson is an experienced attorney from Minnesota who has practiced extensively in the field of commercial class action

litigation. Among other things, Mr. Kaufman and Mr. Johnson testified concerning the risks inherent in class action litigation of this nature, the quality of the work of counsel for the class, reasonable hourly rates and the range of attorneys' fees that would be reasonable for representation of the class in this litigation.

Defendants presented the testimony of John D. French, an attorney from Minnesota. Mr. French is a highly-qualified litigator in the field of business and commercial litigation, including class actions. Mr. French testified concerning reasonable hourly rates for attorneys dealing in the area of business and commercial class action litigation.

## STANDARDS FOR AWARDING FEES

■ The basis for an award of attorneys' fees and expenses in settlement of a class action arises under the general equitable powers of the Court to compensate those who have produced a settlement fund so that those who will share in the benefits will share the burdens. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 341 F.Supp. 1077, 1082 (E.D. Pa.1972). This principle was established in *Trustees v. Greenough,* 105 U.S. 527, 536, 26 L.Ed. 1157 (1881), and has been reaffirmed by the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257–58, 95 S.Ct. 1612, 1621–1622, 44 L.Ed.2d 141 (1975).

> The Court stated:
>
> In *Trustees v. Greenough,* the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed.

*Id.* (citations omitted).

In the context of an antitrust action, *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.,* 481 F.2d 1045 (2d Cir. 1973), the Second Circuit observed:

> In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation.

*Id.* at 1050.

Courts have also recognized that reasonable and adequate fee awards in class actions contribute to the continued enforcement of the securities laws. *Bleznak v. C.G.S. Scientific Corporation,* 387 F.Supp. 1184, 1189 (E.D.Pa.1974); *Bailey v. Meister Brau, Inc.,* 378 F.Supp. 883, 886 (N.D.Ill.1974).

■ This fee application does not fit precisely within the parameters of the "equitable fund doctrine" since the burden of the fees will not be borne by the class. As part of the settlement, IDS and Trust have agreed to pay such attorneys' fees and expenses as are awarded in a final judgment. Nevertheless, the standards for awarding attorneys' fees must apply with equal force in this context. As stated in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974):

> For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding "windfall fees" and that they should likewise avoid every appearance of having done so.

*Id.* at 469.

*See also, Prandini v. National Tea Co.,* 557 F.2d 1015, 1020 (3d Cir. 1977).

During the preceding decade Courts often determined attorneys' fees by multiplying the amount recovered by a percentage that was determined to be reasonable. In *Epstein v. Weiss,* [1970–1971 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,938 (E.D.La. 1970), that Court awarded 30% of the settlement stating, "[c]ases considering fee awards reflect that counsel fees are customarily awarded in class actions on the basis of applying a percentage formula to the result achieved." *Id.* at 90,476. A review of recent decisions discloses that Courts have analyzed in greater detail the factors

deemed relevant in awarding fees. *See Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 298 (3d Cir. 1974) (first appeal), 515 F.2d 165, 168 (1975) (second appeal); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 164–70 (3d Cir. 1973) ("*Lindy I*"); *Lindy Bros. Builders, Inc. v. American Radiator & Sanitary Corp.*, 540 F.2d 102, 112–22 (3d Cir. 1976) ("*Lindy II*"); *City of Detroit v. Grinnell Corp.*, ("*Grinnell I*"), 495 F.2d 448, 469 (2d Cir. 1974); *City of Detroit v. Grinnell Corp.*, ("*Grinnell II*"), 560 F.2d 1093, 1098–1102 (2d Cir. 1977).

In *Grunin v. International House of Pancakes*, 513 F.2d 114, 127 (8th Cir. 1975), the Eighth Circuit reviewed the existing authorities with regard to discretionary awards of attorneys' fees in class actions. That Court reasoned:

> The formulation adopted by the Third Circuit in *Lindy Bros.* and reiterated in *Merola* provides a typical example of the factors that courts have been instructed to consider in establishing fee awards:
>
> a) the number of hours spent in various legal activities by the individual attorneys,
>
> b) the reasonable hourly rate for the individual attorneys,
>
> c) the contingent nature of success, and
>
> d) the quality of the attorneys' work. However, as the Second Circuit recognized in *City of Detroit*, the "only legitimate starting point" in establishing fees is "by merely multiplying attorney's hours and typical hourly rates. * * * It is only after such a calculation that other, less objective, factors can be introduced into the calculus."

*Id.* at 127 (citations omitted).

■■■ Subsumed within the four criteria outlined by the Eighth Circuit are a host of other considerations delineated by recent cases which this Court has reviewed. *See generally Beecher v. Able*, 435 F.Supp. 397 (S.D.N.Y.1977); *In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303 (C.D.Cal.1977); *Rubenstein v. Republic National Life Insurance Co.*, 74

F.R.D. 337 (N.D.Tex.1976); *In re King Resources Co. Securities Litigation*, 420 F.Supp. 610 (D.Colo.1976). This Court regards the criteria set forth in *Grunin* as the essential components for its determination of an award of reasonable attorneys' fees and expenses.

## REASONABLE FEES FOR COUNSEL

### 1. HOURS SPENT

There is essentially no dispute between the parties as to the accuracy of the time records submitted by counsel for the class. The Court has reviewed those records and finds them to be detailed and complete. Furthermore, counsel for the class have provided the Court with affidavits setting out the hours spent in various activities in the litigation by each of the attorneys within the two firms. Moreover, the Court has had the opportunity to compare the hours of counsel for the class and counsel for defendants. With due regard for the need for separate counsel in representing multiple defendants, the Court notes that defendants expended three times the number of hours that counsel for the class expended on all phases of this litigation.

Defendants, while not contesting the reasonableness of the number of hours spent by counsel for the class, do challenge whether certain of those hours (travel time, time spent reviewing defendants' reports, appellate time) should be subject to increases for risk and quality. The defendants also assert that none of the hours spent in prosecuting the fee application should be compensated. These arguments will be addressed later.

■■■ Defendants also assert that time spent by para-professionals should be allocated to expense. The Court agrees with defendants' reasoning on this point. In *Grinnell I, supra*, the Second Circuit acknowledged that para-professional time was a reimbursable expense, but held that, "their time cannot be considered as input in the fee award determination." 495 F.2d at 473.

The Court finds that counsel for the class devoted 4,564.4 hours to the resolution of

this litigation on the merits, and 1,853.65 hours in prosecuting their fee application and that those hours are reasonable.

## 2. HOURLY RATE

In *Grunin*, the Eighth Circuit adopted the approach of the Second Circuit in determining what hourly rate is to be applied to the hours expended in arriving at a determination of attorneys' fees. "[A]s the Second Circuit recognized in *City of Detroit*, the 'only legitimate starting point' in establishing fees is 'by merely multiplying attorney's hours and *typical* hourly rates.' " (emphasis added) 513 F.2d at 127.

■ In *Grinnell I*, the Second Circuit directed the lower court to establish a reasonable hourly rate by determining, "the hourly amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation." 495 F.2d at 471. The Second Circuit reaffirmed its definition of an appropriate hourly rate in *Grinnell II*, where the Court stated:

> We directed the district court to begin its inquiry on remand by first calculating the basic value of appellee's services. This was to be derived by multiplying the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area.

560 F.2d at 1098. The Second Circuit's definition of hourly rate has been followed by the lower courts. *Burger v. CPC International, Inc.*, 76 F.R.D. 183, 188 (S.D.N.Y. 1977); *Barnett v. Pritzker*, 73 F.R.D. 430, 431 (S.D.N.Y.1977); *Entin v. Barg*, 412 F.Supp. 508, 517 (E.D.Pa.1976); *In re Gypsum Cases*, 386 F.Supp. 959, 967 (N.D.Cal. 1974).

Defendants argue that counsel for the class should be limited to the hourly rate that they charged for non-contingent work during the course of this litigation. Counsel for the class urge that the Court should examine hourly rates from securities class actions across the nation since this action was national in scope.

This Court has considered a number of factors in arriving at "typical hourly rates" as required by *Grunin*. At the hearing on the application, the Court received testimony from Messrs. Kaufman, Johnson and French concerning their hourly rates, the hourly rates of counsel for the class, the hourly rates of defense counsel and the hourly rates of attorneys similar to counsel for the class in skill, experience and nature of practice. The Court has reviewed records of counsel for the class and defense counsel relating to hourly rates charged in this and other litigation. The Court has reviewed evidence of the considerable expertise and experience of counsel for the class in the area of class action and securities litigation.

■ Of particular importance in establishing reasonable hourly rates is the Court's own knowledge of the nature of the work and experience of counsel for the class which the Court has acquired through this litigation and other matters in which they have appeared before this Court. Furthermore, the Court has drawn on its own experience and knowledge of hourly rates charged by attorneys of like skill within the general area in which counsel practice. *See generally In re Sugar Industry Antitrust Litigation*, Master File No. MDL–201 (N.D. Cal. Filed November 28, 1979); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245 (N.D.Ill.1979). The Court has also considered several of the recent decisions which have reported hourly rates in arriving at awards of attorneys' fees in securities class actions [2] and the Court's own experience in

---

**2.** *See, e. g., Weiss v. Drew National Corp.*, 465 F.Supp. 548 (S.D.N.Y.1979); *In re Magic Marker Securities Litigation*, 470 F.Supp. 862 (E.D. Pa.1979); *Baron v. Commercial & Industrial Bank of Memphis*, [Current Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,132 at 96,243 (S.D.N.Y.1979); *Slade v. Shearson, Hammill & Co., Inc.*, 79

F.R.D. 309 (S.D.N.Y.1978); *Shapiro v. Consolidated Edison*, [1978 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,364 at 93,250 (S.D.N.Y.1978); *TBK Partners, Ltd. v. Warshow*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,196 at 92,401 (S.D.N.Y.1977); *Miller v. Fisco, Inc.*,

establishing reasonable hourly rates in determining fee awards in class actions.[3]

Taking into account all of the factors which have been delineated, the Court finds that the normal hourly rate charged for similar litigation by senior attorneys and associates of the skill and experience of counsel for the class is $125 per hour and $60 per hour respectively.

### 3. CONTINGENCY FACTOR

█  Having determined the number of hours spent by counsel for the class in this litigation, and the reasonable hourly rate that should be applied to those hours, the Court must then determine whether the base fee should be adjusted to reflect less objective factors such as the contingent nature of success. Defendants concede that counsel are entitled to an increase for both risk and quality. The question presented here is whether the Court should adjust the base fee to compensate counsel for undertaking a matter upon which compensation will be forthcoming only if it can be successfully concluded.

Perhaps the most comprehensive delineation of the elements which should be considered in evaluating risk is set forth in *Lindy II, supra,* where the Third Circuit Court of Appeals reasoned:

Under the rubric of "the contingent nature of success" the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit. The court may increase the amount established in the computation of the "lodestar" as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,— whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.

540 F.2d at 117.

The complexity of this litigation is best described in a letter by defense counsel which states: "The facts involved, presently under preliminary development and study, are very complex and the legal issues presented are in a developing field of the law."

Plaintiffs alleged sixteen different areas of misrepresentation and omission in the separate registration statements and prospectuses for Trust's five series of debentures which were offered to the public over a period of two years. Serious questions were presented dealing with reliance, statutes of limitations and the existence of common questions of fact and law as to each of the 25,000 debentureholders. Early in the litigation, counsel for the class were confronted with efforts by the defendants to survey the class members with regard to such issues as reliance. Developing areas of the law such as "indirect reliance" and "integrated offering" were presented by coun-

---

[1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,348 at 93,186 (E.D.Pa.1978).

**3.** *See generally In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975).

sel for the class in order to overcome objections to the class.

The defendants' continuing relationship with the class as holders of Trust's debentures created complex issues requiring the resolution of the needs of defendants for public disclosure while avoiding undue influence on the class. Prior to the settlement of this litigation, this issue had been briefed and was scheduled for argument in the Eighth Circuit on an expedited appeal.

The time commitment of counsel for the class was substantial. Many of the issues argued before this Court required hearings to be held on short notice in order to accommodate the ongoing relationship between defendants and the members of the class. The expedited appeal to the Eighth Circuit bears witness to the urgent attention that counsel for the class were required to devote to this litigation.

Defendants' liability was never clear. There had been no prior governmental proceedings or civil suits which could provide counsel for the class with any measure of certainty as to the outcome of this litigation. Defendants argue that certain class actions in behalf of Trust's stockholders had paved the way for this litigation. The Court is familiar with the stockholder class actions as they are pending before it. *See Byrnes v. IDS Realty Trust*, 70 F.R.D. 608 (D.Minn.1976). The issues in these two matters are different and, indeed, the stockholder class action is still pending.

The Court has reviewed other cases involving real estate investment trusts ("REIT's").[4] A review of these cases shows that securities litigation involving REIT's are highly complex and present a significant risk of unsuccessful outcome. Indeed, one of the witnesses appearing at the hearing on this application testified that his firm refused to accept a case involving claims against a REIT because of the risks involved in the litigation.

The many hours devoted by counsel for the class to discovery, pleadings, motions and an appeal have been undertaken without guarantee of success. Devoting several attorneys in one firm to a single case for a two year period is a significant financial burden. The Court must consider the fact that for nearly two years class counsel were required to bear overhead cost and litigation expenses while foregoing the opportunity to do work which was not contingent on its outcome.

This litigation and the fee application have been vigorously and ably contested by defense counsel. Defendants opposed certification of the class and much of plaintiffs' discovery while pressing discovery of their own. Defendants' intractability to settlement beyond their initial proposal has resulted in arduous and complex negotiation. Their insistence on extending the terms of their original proposal directly to the class members after it was rejected by counsel for the class resulted in complex problems in managing this class action.

The duration of this litigation has caused substantial delay in the receipt of payment for the services class counsel rendered to the class. Further delay is possible since IDS and Trust have the right to appeal any award of fees and expenses.

Defendants have argued that the risk was less after settlement negotiations commenced and that certain activities should not be included when determining the amount to be awarded for the risks assumed. Both of these arguments were rejected in *In re Equity Funding Securities*

---

4. *See generally Turner v. First Wisconsin Mortgage Trust*, 454 F.Supp. 899 (E.D.Wis.1978); *Poller v. First Virginia Mortgage and Real Estate Investment Trust*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,564 (E.D.Va.1978); *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y. 1978); *Bowe v. First of Denver Mortgage Investors*, 562 F.2d 640 (10th Cir. 1977); *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283 (W.D.N.Y.1977); *Elster v. Alexan-der*, 76 F.R.D. 440 (N.D.Ga.1977); *Gross v. Diversified Mortgage Investors*, 438 F.Supp. 190 (S.D.N.Y.1977); *Kamens v. Chase Manhattan Mortgage and Realty Trust*, 443 F.Supp. 130 (S.D.N.Y.1977); *Blumenthal v. Great American Mortgage Investors*, 74 F.R.D. 508 (N.D.Ga. 1976); *Petersen v. Federated Development Co.*, 416 F.Supp. 466 (S.D.N.Y. 1976); *Trattner v. American Fletcher Mortgage Investors*, 74 F.R.D. 352 (S.D.Ind.1976).

*Litigation, supra,* where District Judge Lucas reasoned:

> Having determined that this case involved substantial risk to counsel who were active in its prosecution, it is virtually impossible for this Court to pick some point during the past four years at which time the risk began to substantially diminish. Furthermore, it would be an impossible task for this Court to assign different risk values to the thousands of tasks which have been performed. Such an expenditure of judicial resources is neither suggested nor compelled by previous judicial precedent.

438 F.Supp. at 1336 (footnote omitted). Each of the attorneys who testified at the hearing on the application, including defendants' witness, testified that they charged the same hourly rate for the various tasks performed in litigating any case.

▆▆ Having determined that counsel for the class faced substantial risk in connection with their representation of the debentureholders in this litigation, the Court awards $800,000 to them in recognition of that risk for time devoted through the hearing on the settlement.

### 4. QUALITY FACTOR

▆▆ In addition to the contingency factor, the Court is permitted, under the criteria set forth in *Grunin,* to adjust a fee award to reflect the quality of work performed on behalf of the class. *Lindy II* again provides excellent criteria for determining whether to adjust the fees to reflect the quality of the work performed. In *Lindy II,* the Third Circuit reasoned:

> In determining whether to adjust the "lodestar" for quality work or not, the district court may consider, *inter alia:*
>
> 1. The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, *i.e.,* a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, *i.e.,* permitting the court "to recognize and reward

achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested . . . ." *Merola II, supra,* 515 F.2d at 168.

> 2. An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.

540 F.2d at 118.

In analyzing the quality of work performed, it becomes apparent that there is a significant overlap with the elements considered under the contingency factor and, to a degree, a correlation between the risks assumed and the quality of the work performed. Counsel for the class are experienced and proficient lawyers. Their experience and capability can be seen in the quality of their pleadings, arguments before this Court and management of this litigation. The Court is satisfied that, in the face of a vigorous and skillful defense by counsel for defendants, the experience of counsel for the class contributed to the expeditious handling of many aspects of this litigation, such as the mailing of 35,000 notices and the handling of inquiries from class members. In addition, they provided the class with reports as to the progress of the litigation and settlement negotiations, a procedure which is somewhat unique in the management of class action litigation since class members are often uninformed as to the progress of a case until it is concluded.

As previously pointed out, in litigation of this nature, recovery of any amount is problematical at best. Thus, many Courts have emphasized the results achieved in evaluating the quality of the work performed. In *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597 (D.Colo.1974), that Court observed that "[w]hile other criteria in determining reasonable attorney fees are legitimate considerations, the amount of the recovery, and end result achieved, is of primary importance." *Id.* at 605. *See also Bailey v. Meister Brau, Inc.,* 378 F.Supp. 883, 886 (N.D.Ill.

1974). However, *Lindy II* teaches that the evaluation of quality on the basis of results achieved must take into account the time expended to achieve those results. In *Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975), the Third Circuit observed that a Court can "recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested." *Id.* at 168.

The negotiated settlement has been previously described. At the hearing on the approval of the settlement and the fee application hearing, the Court received documentary evidence and heard testimony on the value of the settlement to the class.

As previously noted, Trust was contemplating bankruptcy and the debentures were trading between 20% and 30% of principal in a thin market when this litigation was commenced. At the time the settlement was achieved, the deficit in Trust's net assets had increased to more than $20 million, and defendants' own experts predicted a shortfall of up to $72 million.

As a result of the settlement, each debentureholder had the option of receiving 80% of principal. All parties agree that the price of 80% exceeded the market value of some higher grade debt investments with comparable yields and maturities. In fact, fifty percent of the debentureholders elected to tender their debentures under the terms of the settlement.

Those debentureholders who did not elect to tender their debentures were left with a much improved prospect for payment of their investment in full at maturity. Instead of contemplating bankruptcy, at the time of the fee hearing Trust had a net equity in excess of $12 million with a projected net equity of $20 million after all debentures were paid in full. Witnesses at the hearing calculated the benefits to the debentureholders at between $86 million and $100 million. One of the witnesses

characterized the result not as a settlement, but as a complete recovery, since those debentureholders who wanted liquidity were able to sell their debentures at a fair market price, and those who did not had a reasonable prospect of being paid in full at maturity. The position of counsel for the class regarding the value of the benefits derived by the debentureholders as a result of the settlement is essentially unchallenged by defendants.[5]

It is clear to the Court that the result achieved by counsel for the class is exceptional. And furthermore, the class members have received these benefits without the burden of attorneys' fees or expenses. The Court also notes that, although the time commitment to this litigation was both substantial and intense, counsel for the class achieved this result for the class in a relatively short period of time.

In *Dunn v. H. K. Porter Co.*, 78 F.R.D. 41 (E.D.Pa.1978), the Court made the following pertinent observation:

[W]ith respect to the quality factor, due weight must be given to the reasonably expeditious manner in which counsel have pursued their clients' interests. As noted in *Lindy II, id.* at 118, the court should be conscious of "rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant use of which was to delay or obstruct the proceedings." Further, "[q]uality in this sense includes efficiency. If the attorney achieves good results with a minimum time expenditure, the total award may be increased to reflect efficiency and benefit to the client." *Prandini v. National Tea Co.*, 557 F.2d 1015, 1019–20 (3d Cir. 1977). The speedy resolution of the dispute by settlement inures to the benefit of the pensioners because plaintiffs' counsel minimized the hours spent and assured that the proceeds

---

**5.** Defendants do challenge what portion of the benefits are the direct result of counsel's efforts and assert that most of the benefits would have occurred, absent the litigation, as a result of business considerations of defendants. The Court has addressed this argument *supra* at pp. 1183–1185.

will be distributed to class members as soon as possible.

*Id.* at 45–46.

■ In recognition of the quality of the work of counsel for the class in this litigation, the Court awards $800,000 to them for the time devoted through the hearing on the settlement.

## TIME SPENT ON FEE APPLICATION

Defendants contend that counsel for the class are entitled to no award for time spent in recovering their fees and expenses in this litigation. Counsel for the class urge that they are entitled to a fee for this time and that the fee should include an allowance for both risk and quality. The stipulation acknowledges that they are entitled to an award of some reasonable amount for attorneys' fees and expenses, but is otherwise silent as to what activities in this litigation are compensable.

The stipulation does provide for the accrual of interest at 7% compounded annually on the ultimate award, beginning 90 days after entry of the order dismissing the action. This provision can be seen as partially off-setting delay in receipt of attorneys' fees and expenses, but the stipulation does not say that it is in lieu of fees for time spent in processing the fee application.

There is substantial merit to the position of counsel for the class on this matter. This fee application is unlike those instances in which the recovery of fees and expenses diminishes the recovery by the class. In those instances fees are generally not allowed since the time spent in applying for the fees does not benefit the fund created for the class. *See Lindy II,* 540 F.2d 102, 111; *Grinnell II,* 560 F.2d 1093, 1102.

In this instance the time and expenses of counsel for the class in applying for fees benefits the settlement fund. The fund created for the benefit of the debenture-holders will not be diminished by an award of fees and expenses since the settlement they negotiated specifically provides that IDS and Trust will pay the fees and expenses. In situations similar to this, at least five Circuit Courts have ruled that

such time is compensable. *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir. 1979); *Weisenberger v. Huecker,* 593 F.2d 49, 53–54 (6th Cir. 1979); *Johnson v. State of Mississippi,* 606 F.2d 635, 638 (5th Cir. 1979); *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir. 1978); *Prandini v. National Tea Co.,* 585 F.2d 47, 53 (3d Cir. 1978).

■ In *Johnson v. State of Mississippi,* 606 F.2d 635 (5th Cir. 1979), the Fifth Circuit allowed for an award of attorneys' fees in protecting a fee award on appeal. Under the circumstances presented in this case, counsel for the class are entitled to an award of attorneys' fees for the time expended in prosecuting their fee application. *Id.* at 638.

■ Much of the discovery and a substantial portion of the hearing on this fee application have been necessitated by defendants' contention that the benefits derived by the class from the settlement of this litigation were not the result of the efforts of counsel for the class. Defendants have vigorously urged this position in pleadings and arguments. Almost every facet of the fee application has been rigorously contested by defendants and, even with the entry of this Court's Order awarding attorneys' fees and expenses, there still exists the risk of delay of receipt of payment as a result of appeals. These factors are well within the criteria set forth in *Lindy II* as the basis for adjusting an award of fees based on the contingent nature of success. 540 F.2d at 117. Therefore, in recognition of those risks assumed by counsel for the class in shifting the burden of their attorneys' fees and expenses from the class to the defendants, Trust and IDS, the Court awards $225,000 to them for time devoted in this phase of the litigation.

■ The Court makes no award for the quality of work in processing their fee application. The Court considers such an award to be only relevant to time devoted to the case on its merits.

EXPENSES

 The Court has reviewed the records of expenses incurred by counsel for the class in the case on the merits and in the fee application proceedings. The Court has had the benefit of reviewing the expenses of defendants in this litigation as well. Several of the witnesses testified as to the reasonableness of the expenses incurred by counsel for the class. The para-professional expense incurred by them should be included under the category of expenses.

The Court has determined that all of the expenses requested by counsel for the class were necessary to the litigation and reasonable. The Court awards $124,482.65 as reimbursement for those expenses.

SUMMARY

 Under the circumstances of this case, the Court has determined that the agreement between counsel for the class as to the division of fees is appropriate and makes the following award to the firms of Plunkett, Schmitt & Plunkett and Popham, Haik, Schnobrich, Kaufman & Doty on their joint application for attorneys' fees and expenses:

Attorneys' Fees:
| | | |
|---|---|---|
| A. | Base fee for time spent on the merits: | $ 545,609.50 |
| B. | Increase for risk on the merits: | 800,000.00 |
| C. | Increase for quality on the merits: | 800,000.00 |
| D. | Base fee for time spent on application: | 226,558.25 |
| E. | Increase for risk on application: | 225,000.00 |
| | Total Fees: | $2,597,167.75 |

Expenses:
| | | |
|---|---|---|
| A. | Legal assistants and law clerks: | $ 4,341.25 |
| B. | Expenses incurred on the merits: | 56,342.71 |
| C. | Expenses incurred on application: | 63,798.69 |
| | Total Expenses: | $124,482.65 |

The total attorneys' fees awarded are reasonable when compared with the results in other securities class actions. The cases that this Court has reviewed indicate that awards of attorneys' fees have been within the range of 10% to 30% of the settlement fund and that risk and quality multiples have been awarded in the range of one to four times the base fees. One of the witnesses who reviewed the records of defense counsel testified that he observed several instances in which defense counsel's fees were in excess of nine times their billing rate. The award to counsel for the class in this litigation represents less than 5% of the benefits attributed to the settlement. The increase for risk and quality over the total base fee awarded is a multiple of less than 3.5.